925 P.2d 606 (1996)
130 Wash.2d 517
The STATE of Washington, Respondent,
v.
Edward Lee KING, Petitioner.
In re the Personal Restraint Petition of Edward Lee KING, Petitioner.
No. 63247-2.
Supreme Court of Washington, En Banc.
Argued March 27, 1996.
Decided October 24, 1996.
*608 Patricia Novotny, Seattle, for petitioner.
Christine Gregoire, Atty. Gen., Thomas Young, Talis Abolins, Asst. Attys. Gen., Olympia, Norm Maleng, King County Prosecutor, Theresa Fricke, Deputy, Seattle, for respondent.
*607 MADSEN, Justice.
The principal issue in this case is whether the Indeterminate Sentence Review Board properly based an exceptional minimum sentence partly upon disclosures the defendant made while undergoing court-ordered sexual psychopathy treatment. We affirm the Court of Appeals, which held that use of the defendant's disclosures did not offend the Fifth Amendment.

Facts
In July of 1981, the King County prosecutor charged Edward King with four counts of first degree rape while armed with a deadly weapon. The parties reached a plea agreement whereby King would plead guilty to two counts of first degree rape while armed with a deadly weapon and admit raping all four victims, and the State would recommend that he be sent to Western State Hospital for treatment as a sexual psychopath pursuant to RCW 71.06. The court accepted this plea on September 17, 1981. On October 21, 1981, the court sentenced King to two consecutive 20-year terms and suspended that sentence on several conditions, the most important being that King enter, and successfully complete, the sexual psychopathy program at Western State. The court then ordered King to Western State to undergo evaluation for determination of sexual psychopathy.
On January 18, 1982, King pleaded guilty in Snohomish County to three additional counts of first degree rape while armed with a deadly weapon. Before sentencing for those crimes, King was transferred to the custody of the Department of Corrections. He was subsequently returned to Western State for re-evaluation of his amenability to treatment.
In April of 1982, hospital staff reported to the King County Superior Court that King was a sexual psychopath. The report noted that during an intake assessment interview, King admitted committing five rapes in California and seven rapes in Washington between 1976 and 1981 for which he was never prosecuted. Based on that report, the court found King to be a sexual psychopath and committed him to Western State. This commitment was made subject to sentencing in Snohomish County.
On May 7, 1982, the Snohomish County court sentenced King to three consecutive 20-year sentences. The court suspended these sentences on the condition that King comply with all of the conditions set forth in his King County sentences. Pursuant to a subsequent stipulation between the parties, King agreed to be subject to the jurisdiction of King County with respect to his Snohomish County convictions.
King participated in the sexual psychopathy program for nearly three years and completed all of its 10 steps. During his treatment, he admitted to staff members in the program that he had committed approximately 40 to 50 rapes in addition to the ones of which he was convicted. Despite his completion of the program, the hospital staff was concerned that King "may not have integrated the necessary changes needed which would impact his character and personality." Clerk's Papers (CP) at 104. The hospital staff sought a second opinion from Irwin Dreiblatt, Ph.D., a sex offender program consultant. In February 1986, the staff at Western State reported to the court that *609 while King had received the maximum benefit of treatment and should not be recommitted for further treatment, he was not safe to be at large. In support of its conclusions, the staff gave the court copies of evaluations performed on King at the hospital's request. The hospital also provided a copy of an evaluation prepared at defense counsel's request. In the evaluations of both the defense psychologist and the hospital staff, King confessed to approximately 50 rapes.
On April 25, 1986, the King County Superior Court revoked King's suspended sentences and committed him to the Department of Corrections. The court found that King had failed to successfully complete the sexual psychopathy program and had therefore violated the conditions of his probation. The court reinstated the original sentences in King and Snohomish counties with credit for time served in the Western State program, and ordered the King County terms to run concurrently with the Snohomish County terms. King appealed the revocation as an abuse of discretion and a denial of due process, but the Court of Appeals dismissed the appeal as frivolous and granted appellate counsel's motion to withdraw.
In January 1987, the Indeterminate Sentence Review Board (hereafter referred to as the Board) conducted an admission hearing and set King's minimum terms at 180 months on Count 1 of his Snohomish County convictions, 95 months on each of Counts 2 and 3 of the Snohomish County convictions, and 84 months on each of the two King County convictions. The Board maintained the concurrent/consecutive designations ordered by the trial courts, whereby the minimum terms for each cause number would run consecutively to each other but concurrently with the terms for the other cause number. The total minimum term thus was 370 months (180 plus 95 plus 95). The Board based this exceptional term in part on Western State's 1986 report on King as well as the subsequent evaluations of King.[1] The Board also noted that King himself stated at the admission hearing that he "had upwards of 55 rapes." CP at 98.
In February 1989, King filed a personal restraint petition in the Court of Appeals challenging the Board's reliance on the uncharged and unproved crimes to which he admitted during therapy when setting his exceptional minimum term sentence. King claimed that his therapists had promised him confidentiality. In October 1989, the Court of Appeals transferred the petition to King County Superior Court for a decision on the merits. In February 1992, King moved to withdraw his guilty pleas. King also moved to vacate the trial court judgments and sentences, his probation revocation, and the Board's minimum term. The superior court denied those motions and, following a fact-finding hearing, dismissed the personal restraint petition as well. The superior court found that King was told in February 1982 that information he provided Western State could be made available to the court and that the rules of confidentiality did not apply. The court also found that King was warned that his admissions could be used against him and that he was told that fully admitting his crimes was a treatment requirement. The court found further that while King thought his disclosures would be confidential, he was in fact told that they would be confidential only with respect to third parties such as spouses, friends, and relatives. He never was advised that his disclosures were confidential in regard to the court system, its officers, or agents.
The Court of Appeals affirmed the trial court in all respects. State v. King, 78 Wash. App. 391, 897 P.2d 380 (1995). This court then accepted King's petition for review.

I
The first issue is whether the Board violated the defendant's Fifth Amendment rights by considering statements he made at Western State Hospital in setting his minimum term. The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, commands that no person "shall be compelled in any criminal case to be a witness against himself." This *610 prohibition not only permits a person to refuse to testify against himself at a criminal trial, but also allows him not to answer official questions put to him in any other proceeding, civil or criminal, where the answer might incriminate him in future criminal proceedings. Minnesota v. Murphy, 465 U.S. 420, 426, 104 S.Ct. 1136, 1141-42, 79 L.Ed.2d 409 (1984); Lefkowitz v. Turley, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973).
The availability of the Fifth Amendment privilege thus does not turn on the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure it invites. Post, 118 Wash.2d at 604, 837 P.2d 599; In re Gault, 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967). In any type of proceeding,
"a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant.... Absent such protection, if he is nevertheless compelled to answer, his answers are inadmissible against him in a later [proceeding]."
Murphy, 465 U.S. at 426, 104 S.Ct. at 1141 (quoting Lefkowitz, 414 U.S. at 78, 94 S.Ct. at 322-23).
The Fifth Amendment analysis generally entails two considerations: whether the defendant's statements exposed him to a "realistic threat of self-incrimination" in a subsequent proceeding and whether the State compelled the defendant's incriminating statements. Murphy, 465 U.S. at 427, 104 S.Ct. at 1142. Because the first of these considerations is dispositive, we do not reach the second.

Realistic Threat of Self-Incrimination in a Subsequent Proceeding
The Fifth Amendment clearly is implicated when a defendant's statements revealing prior criminal, but unconvicted, behavior are allowed to influence the sentencing decision. State v. Post, 118 Wash.2d 596, 604, 826 P.2d 172, amended, 118 Wash.2d 596, 837 P.2d 599 (1992; State v. Ammons, 105 Wash.2d 175, 184, 713 P.2d 719, 718 P.2d 796, cert. denied, 479 U.S. 930, 107 S.Ct. 398, 93 L.Ed.2d 351 (1986)). "It is no less important that constitutional guaranties be observed at the sentencing phase than at the investigative and trial phases of a criminal prosecution." Post, 118 Wash.2d at 605, 826 P.2d 172; see also State v. Tinkham, 74 Wash.App. 102, 106, 871 P.2d 1127 (1994).
However, the setting of a minimum term is not part of a criminal prosecution and the full panoply of rights due a criminal defendant in such a proceeding thus does not apply. In re Whitesel, 111 Wash.2d 621, 630-31, 763 P.2d 199 (1988); In re Sinka, 92 Wash.2d 555, 566, 599 P.2d 1275 (1979). The United States Supreme Court stated more explicitly in Murphy that although a revocation proceeding must comport with the requirements of due process, it is not a criminal proceeding to which the Fifth Amendment applies, so long as the questions put to the probationer are relevant to his probationary status and pose no realistic threat of incrimination in a separate criminal proceeding. Murphy, 465 U.S. at 435 n. 7, 104 S.Ct. at 1146 n. 7.
Just as there is no right to a jury trial before probation may be revoked, neither is the privilege against compelled self-incrimination available to a probationer.
. . . .
Our cases indicate, moreover, that a State may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination.
Id. at 435 n. 7, 104 S.Ct. at 1146 n. 7.
King was sentenced to several 20-year terms which were suspended on condition he successfully complete the sexual psychopathy program at Western State Hospital. In accordance with the statutory requirements of the sexual psychopathy program, the trial court sentenced King before considering the allegation of sexual psychopathy and any *611 possible disclosures of uncharged crimes. RCW 71.06.030.
Participation in the sexual psychopathy program is governed by statute. Initially, a court must refer a defendant for an evaluation to determine sexual psychopathy. RCW 71.06.040. Upon completion of the observation period used to determine whether a defendant is a sexual psychopath, the superintendent of the state hospital "shall return the defendant to the court, together with a written report of his findings as to whether or not the defendant is a sexual psychopath and the facts upon which his opinion is based." RCW 71.06.050 (emphasis added). RCW 71.06 clearly contemplates the use of treatment disclosures by the trial court in evaluating a defendant's amenability to treatment. The statutes go on to provide that during post-commitment proceedings the court is authorized to consider "any relevant documents and other evidence" to determine a defendant's disposition. RCW 71.06.091. Pursuant to the statutes, Western State Hospital was required to advise the King County Superior Court of King's admissions of additional criminal activity, made during both the evaluation and treatment phases of the Sex Offender Program, because those admissions were relevant to King's safety to be at large, his status as a sexual psychopath and his amenability to treatment.
While potentially incriminating, King's disclosures during treatment were necessary to that treatment and his successful completion of his probation requirements. At the end of treatment, the court appropriately examined the treatment records and the disclosures contained therein to determine King's proper disposition. Thus, King's disclosure regarding 55 rapes was relevant to his probation status and was properly considered by the court in his revocation proceeding.[2]
It follows that King's disclosures could be used by the ISRB following a revocation hearing to set a minimum term since setting a term is an administrative act which follows sentencing. In re Ayers, 105 Wash.2d 161, 164, 713 P.2d 88 (1986). Once he was referred to the Board, that body considered only that information already considered by the court in revoking probation. The Board did not seek any additional disclosures or statements from King.
King maintains, however, that the sexual psychopathy statutes limit use of treatment information to the purposes of the sexual psychopathy program, and do not allow the Board to consider such information in setting a minimum term. He fails to recognize that the statutes expressly allow the transfer of treatment information to the Department of Corrections or the Board. RCW 71.06.270 provides that the "records, files, and other written information" prepared by the department of social and health services for individuals committed under the sexual psychopathy chapter "shall be made available upon request to the department of corrections or the board of prison terms and paroles for persons who are the subject to the records who are committed to the custody of the department of corrections or the board of prison terms and paroles."[3] It is apparent that one purpose of RCW 71.06 is to assist the Board in sentencing an inmate who is deemed unamenable to treatment by the trial court.
King also contends that the setting of the minimum term by the ISRB must be treated as a sentencing proceeding and cites Pens v. Bail, 902 F.2d 1464 (9th Cir.1990) in support of this contention. In Pens, the defendant was committed to the sexual psychopathy program at Western State following convictions for two counts of first degree rape, but he was not sentenced before his commitment. During his treatment, he was assured by his therapists that the information he revealed during treatment would not be disclosed to *612 the court. Id. at 1465. After three years, the hospital returned Pens to court with a report detailing the confessions and statements he made during treatment. Based on this report, the trial judge recommended and the Board sentenced Pens to an exceptional minimum term. The Ninth Circuit concluded that use of these statements as a basis for an exceptional minimum sentence violated Pens' Fifth Amendment rights. Id. at 1466. In its holding, the court observed that the case arose only because the defendant was not sentenced before commitment. Had the trial judge given Pens an "original sentence," information disclosed during Pens' postconviction treatment could not have been used to aggravate the sentence for the original offense. Id. at 1465 n. 1. Thus, the court necessarily considered the setting of the minimum term in that case as a part of the original sentencing.
In contrast to Pens, the disclosures in this case did not affect King's original sentencing since the trial court had imposed sentence prior to King beginning the treatment program. By the time the Board set King's minimum term, the original sentence had been entered and the criminal proceeding was over. The proceeding that King faced when he returned to court was revocation of his suspended sentence. Once the suspended sentence was revoked, the Board had an administrative responsibility to set a minimum term. In setting the minimum term, the Board may properly consider uncharged offenses in making its decision. In re George, 52 Wash.App. 135, 143 n. 4, 758 P.2d 13 (1988) (citing State ex rel. Alldis v. Board of Prison Terms & Paroles, 56 Wash.2d 412, 418-19 n. 2, 353 P.2d 412 (1960)).[4]
The Ninth Circuit also attached significance to the fact that Pens made his disclosures following assurances of confidentiality. Those assurances also distinguish Pens from the case at bar. The trial court found that King was promised only that disclosures during group discussion would be confidential from third parties, such as spouses, friends, and relatives, but that such disclosures would not be confidential from the courts, its officer or agents. CP at 171 (finding of fact 6).
Moreover, in the report prepared by Dr. Comte, King described his treatment as follows:
Mr. King strongly takes exception to Dr. Dreiblatt's statements that he only disclosed the extent of his raping activities and the number of victims when threatened with a polygraph. He says early in his tenure in the Program he admitted to 20 rapes and was debating further disclosure, but was fearful of the Program's response. During one particular therapy session, his then therapist, Charles Dockery, commented:
"Things in your past are like parking tickets, if you put them in a glove box they will end up costing you a lot. If you pay right away, they don't cost as much."
Mr. King says he considered his therapist's comments and after careful documentation, disclosed a total of 50 to 55 victims. A later polygraph examination confirmed his disclosures.
CP at 124.
We conclude that King was not exposed to criminal liability in violation of the Fifth Amendment when the Board used his treatment disclosures to support an exceptional minimum term sentence. AsMurphy recognized, the State may validly insist on answers to incriminating questions and properly administer *613 its probation system so long as the State recognizes that the answers may not be used in a subsequent criminal proceeding.

II
The second issue is whether the trial court erred in denying the defendant's motion to withdraw his guilty pleas. It is reversible error for a trial court to accept a guilty plea without an affirmative showing in the record that the plea was made intelligently and voluntarily. Wood v. Morris, 87 Wash.2d 501, 511, 554 P.2d 1032 (1976); In re Woods v. Rhay, 68 Wash.2d 601, 605, 414 P.2d 601, cert. denied, 385 U.S. 905, 87 S.Ct. 215, 17 L.Ed.2d 135 (1966).
King's initial challenge of his guilty pleas was based on his alleged lack of understanding that consecutive sentences could be imposed. The trial court found no misunderstanding possible after reviewing the records of both pleas, and the Court of Appeals affirmed. King, 78 Wash.App. at 397, 897 P.2d 380. The Court of Appeals addressed only King's argument that he was not properly informed of the possibility of consecutive sentences, even though King also asserted on appeal that he had not been informed of the mandatory minimum sentence that he faced.
The Court of Appeals also declined to discuss the State's contention that the merits of King's challenge, no matter what the scope thereof, need not be addressed at all. This argument is based on the fact that King's guilty pleas were entered in 1981 and 1982, and on the fact that he raised his first challenge to them in 1992.
In 1989, legislation was passed to limit the number of collateral challenges a defendant may make to a conviction. RCW 10.73. RCW 10.73.090 provides that no motion for collateral attack on a judgment and sentence in a criminal case may be filed more than one year after the judgment becomes final if the judgment and sentence is valid on its face and rendered by a court of competent jurisdiction. RCW 10.73.090(1). The statute adds that a motion to withdraw a guilty plea is included within the definition of a collateral attack. RCW 10.73.090(2). The one-year time limit does not apply to a motion based on one or more of the following grounds: (1) newly discovered evidence; (2) the statute that the defendant was convicted of violating is unconstitutional; (3) the conviction is barred by double jeopardy; (4) the evidence was insufficient to support the defendant's conviction; (5) the sentence imposed was in excess of the court's jurisdiction; or (6) there has been a significant change in the law that is material to the conviction. RCW 10.73.100. In addition, RCW 10.73.090 and .100 apply only to motions filed more than one year after July 23, 1989. RCW 10.73.130.
Here, King raised his first challenge to his guilty pleas in February 1992, which is more than one year after July 23, 1989. None of the exceptions to the one-year time limit set forth in RCW 10.73.100 apply to King's situation. Thus, we conclude that this challenge is time-barred under RCW 10.73.090.

III
The third issue is whether the defendant was deprived of effective assistance of counsel because his trial counsel did not raise the psychologist-patient privilege. The two-part test for establishing ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction... resulted from a breakdown in the adversary process that renders the result unreliable.
See also State v. Thomas, 109 Wash.2d 222, 225-26, 743 P.2d 816 (1987).
King contends that this test is satisfied because his trial counsel did not *614 argue that use of his statements made during treatment violated the psychologist-patient privilege. RCW 18.83.110 makes the confidential communications between a client and psychologist privileged against compulsory disclosure. Post, 118 Wash.2d at 612, 826 P.2d 172; In re Henderson, 29 Wash.App. 748, 752, 630 P.2d 944 (1981). The privilege does not apply where it is manifest that the patient did not intend his or her communications to be confidential. Post, 118 Wash.2d at 612, 826 P.2d 172; In re Henderson, 29 Wash.App. at 752, 630 P.2d 944. As with all evidentiary privileges, a person may not claim a privilege as to communications that do not originate in the confidence that they will not be disclosed. Post, 118 Wash.2d at 612, 826 P.2d 172; State v. Coe, 109 Wash.2d 832, 843, 750 P.2d 208 (1988).
This court further explained in Post that an objective inquiry must be made when determining whether the patient intended the communications to be confidential.
The patient's subjective expectations of confidence, while relevant, should not be given more weight than the objective evidence of the situation and circumstances in which the communication was made. A patient's intent that the communication be confidential must be reasonable in light of the circumstances surrounding the communication.
Post, 118 Wash.2d at 612, 826 P.2d 172.
The privilege does not apply in this case. The trial court found that King was warned that his admissions could be used against him and that he was not advised that his admissions would be kept from the courts. The report made following King's intake interview states that King was not promised confidentiality, and King undoubtedly was aware that his disclosures made during that interview were revealed to the court in assessing his status as a sexual psychopath. Further, King submitted his own evaluation to refute the State's position at his revocation hearing. King's continued insistence that he was assured of confidentiality is not reasonable under the facts of this case or in light of the purposes and legal requirements of the sexual psychopathy program.
Accordingly, the failure to raise the psychologist-patient privilege does not satisfy the Strickland test for ineffective assistance of counsel. The failure to raise the privilege was not a serious error which prejudiced King's defense.
We affirm the Court of Appeals and uphold the imposition of the exceptional minimum term sentence in this case.
DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON and TALMADGE, JJ., concur.
SANDERS, Justice (dissenting).
I respectfully dissent on two grounds: the State improperly used Edward King's disclosure of past crimes against him in violation of the Fifth Amendment; and the State's revocation of his suspended sentence arbitrarily deprived him of that process due under the law. I would reverse the ruling of the superior court and grant King's personal restraint petition.

I. THE FIFTH AMENDMENT
At the threshold, I disagree with the majority that Pens v. Bail, 902 F.2d 1464 (9th Cir.1990) is distinguishable from this case. The majority makes much of the footnote in Pens that Pens' habeas corpus petition arose only because he had not already been sentenced. See id. at 1464 n. 1. As the majority reads Pens, what distinguishes the two cases is that the trial judge had not yet given Pens an original sentence when his confessions were used against him, whereas King had been sentenced before commitment. Pens' disclosures, therefore, could not be used to aggravate his sentence without violating his Fifth Amendment rights, while King's could. What the majority fails to appreciate about Pens, however, is that Pens' habeas corpus petition did not concern his original sentence. Pens' petition concerned the exceptional sentence imposed by the Indeterminate Sentence Review Board. So does King's.
The U.S. District Court in Pens had held that "the Board violated Pens' fifth amendment right against self-incrimination by imposing an exceptional minimum sentence *615 based on statements Pens made during post-conviction, court-ordered, confidential therapy." Id. at 1464-65 (emphasis added). The Ninth Circuit affirmed the district court's holding and agreed that an exceptional minimum sentence may not be based on statements the petitioner had made in post-conviction, court-ordered, confidential treatment. Id. at 1466. The court found that Pens' confessions had been used to "enhance his sentence despite representations of confidentiality and requirements of cooperation to participate in the court-ordered treatment program" and concluded that Pens' admissions and confessions were "squarely within the privilege" of the Fifth Amendment. Id. For the majority in this case to hold that Pens does not apply because King had already been sentenced while Pens had not is to emphasize a difference without a distinction. Both Pens and King filed their petitions on the basis of the exceptional sentences imposed upon them by the Indeterminate Sentence Review Board. These exceptional sentences were based upon confessions the two made during treatment at Western State Hospital. Neither concerned the original sentence imposed by the trial court. Pens is therefore directly on point and this court should adopt its reasoning in this case.
By utilizing King's confessions to enhance his minimum sentence, the State violated his Fifth Amendment right not to incriminate himself. The Fifth Amendment applies to the states through the Fourteenth Amendment. State v. Warner, 125 Wash.2d 876, 885, 889 P.2d 479 (1995). Normally, a person must affirmatively invoke the protections of the amendment. However, there are two situations where the privilege against self-incrimination is said to be "self-executing" and the person need not invoke the privilege in order to benefit from its protections. State v. Post, 118 Wash.2d 596, 605, 826 P.2d 172, 178, and amended by 118 Wash.2d 596, 837 P.2d 599 (1992). These two situations are (1) custodial interrogation by a state agent pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966); and (2) situations where the assertion of the privilege would be penalized by the State. Warner, 125 Wash.2d at 884, 889 P.2d 479. The penalty situation was clearly present in King's case.
The penalty exception to the invocation requirement is available only if (1) the person gives answers that would incriminate him or her in a separate criminal proceeding, and (2) the State expressly or impliedly asserts that invoking the Fifth Amendment privilege will result in penalties, either by economic loss or by a deprivation of liberty. Post, 118 Wash.2d at 610, 826 P.2d 172.
It is difficult to imagine how anyone could fail to see that King's confession to 55 rapes could incriminate him in a separate criminal proceeding if one were brought.[1] In King's case, the questions asked of him as part of his treatment at Western State Hospital required him to give answers that would and did incriminate him and which were improperly *616 used to enhance his minimum sentence. Moreover, when King confessed to 55 rapes he left open the possibility of additional criminal prosecutions because these rapes were not ones he had already pleaded guilty to or been charged with. King, therefore, amply satisfied the first requirement of the penalty exception.
As to the second requirement, there was a clear and express assertion on the part of the State through its representatives at Western State that if King refused to disclose his earlier crimes, he would be penalized by revocation of his suspended sentence. In its discussion of the program at Western State, the Ninth Circuit in Pens concluded "[f]ull confession and cooperation [with the sex offender program] were represented as necessary for successful treatment and eventual release." Pens, 902 F.2d at 1465. In King's case, this fact was brought out at the hearing before the superior court by Maureen Saylor, the sex offender program coordinator and a sex offender consultant for Western State Hospital. She (apparently) testified that a patient's continued participation in the program was dependent on his full confession of past sexual crimes.[2] Her testimony reflects that a failure to confess to past crimes would result in a transfer back to superior court and the inevitable revocation of his suspended sentence. In short, King could either confess and stay in the program, or refuse and grow old and probably die in prison. The State expressly asserted that if King exercised his Fifth Amendment privilege, he would be heavily penalized. See Post, 118 Wash.2d at 610, 826 P.2d 172.
Moreover, the record supports King's claim that he was coerced into confessing his crimes with false promises of confidentiality. In its opinion in Pens, the Ninth Circuit found that the patients at Western State were informed that their disclosures were confidential: "The WSH therapists assured Pens information he revealed during treatment would not be disclosed to the courts." Pens, 902 F.2d at 1465. In its Findings of Fact and Conclusions of Law, the superior court in this case appeared to reach a different result based upon the report of Barry Charon and the testimony of Maureen Saylor; however, its findings[3] fail to necessarily *617 and specifically distinguish between warnings and disclosures pertaining to the intake report and warnings and disclosures in group therapy almost one-and-a-half years later. These are critical distinctions.
In his written report of his intake interview with King on February 16, 1982, Mr. Charon, the therapy supervisor at Western State, began by writing: "I advised Mr. King that information furnished for this report would be used for the purposes of determining sexual psychopathy and could be made available to the court if the court requested. I informed him that rules of confidentiality do not apply." Transcript of the Proceedings (RP) (3/5/92) at 68 (emphasis added). This excerpt says nothing about using any information for any reason other than determining sexual psychopathy, and it is expressly limited to information supplied "for this report," i.e., the report based on the February 16, 1982 interview. It was not a blanket declaration that any information provided by Mr. King at any time could be used for any purpose. This, however, was exactly the meaning attributed by the superior court to this written excerpt.
Moreover, Mr. Charon was nowhere to be found for the hearing in superior court, and the trial court only had his hearsay written statement before it. RP (3/5/92) at 67. This written report was admitted into evidence by the trial judge and was read into the record by Saylor. RP (3/5/92) at 68. This report was signed by Charon, not King. There was no evidence King even saw it. The reporta statement made outside of the ongoing hearingwas offered by the State as evidence of the truth of the matters asserted therein, namely, that King had been informed the rules of confidentiality did not apply. See ER 801. Charon's letter could be used by any evidence professor in any law school as a pristine example of hearsay. I find it distressing that King's liberty hinged in part on a piece of evidence whose accuracy was unchallengeable and whose author was unavailable for cross-examination.
In addition, basing such a conclusion upon Charon's report is completely illogical. King's intake interview took place on February 16, 1982. Clerk's Papers (CP) at 172. On April 2, 1982, Western State Hospital informed the King County Superior Court of King's status as a sexual psychopath based on this report. CP at 173. On May 6, 1982, the King County Superior Court ordered King to be committed to Western State Hospital. CP at 174.
Had this been the end of King's movement through the system, Charon's warning, if indeed there had been one, could conceivably still have applied. King still had much more traveling to complete, however, before he finally settled in at Western State. On May 7, 1982, the Snohomish County Superior Court sentenced King to three consecutive 20-year sentences for his rape convictions there and he was ordered to prison. CP at 174. Therefore, on November 11, 1982, King was discharged from Western State and transferred to the custody of the Department of Corrections. CP at 174. On May 12, 1983, pursuant to a stipulation between King and Snohomish County, King agreed to be subject to the jurisdiction of King County with respect to his Snohomish County convictions, which were suspended on the same terms and conditions as his King County sentences. CP at 174. On June 2, 1983 (almost one-and-a-half years after the initial report in a different proceeding), King was readmitted to Western State Hospital *618 for re-evaluation as a sexual psychopath and for possible treatment. Sometime between June 2, 1983 and August 24, 1983, King admitted to staff members at Western State that he had committed approximately 40 to 50 rapes in addition to the ones for which he was convicted. CP at 175.
One year and three months had passed between the time King was supposedly warned of the lack of confidentiality for information he supplied for the February 1982 report and King's confession. In that period, King had been incarcerated at Western State twice, been in custody of the Department of Corrections once, and likely been kept in the King and Snohomish County jails numerous times. If King interpreted the warning given at the beginning of his intake interview as still in effect all those months later, he was not paying attention to the literal language of the warning, assuming it was communicated to him in the first place.
Maureen Saylor testified she subjectively believed the normal rules of confidentiality did not apply to the sex offender program. RP at 126-27. She also testified, however, that there was no written policy concerning confidentiality at the program.[4] There was no testimony that this "unwritten rule" was ever effectively communicated to the patients at Western State.
The problem is the sexual psychopathic program, in which King was a "patient," was designed and maintained for therapy and treatment, not to meet minimum constitutional requirements of criminal procedure. These therapists and mental health professionals were there to treat disorders but demonstrated little inclination for, much less expertise in, the law. If anything, mental health professionals normally espouse confidentiality as an imperative for a successful relationship between patient and therapist, which is precisely the opposite from normal criminal procedure:
Effective psychotherapy ... depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears.... [T]he mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.... [A] psychiatrist's ability to help her patients "is completely dependent upon [the patients'] willingness and ability to talk freely." This makes it difficult if not impossible for [a psychiatrist] to function without being able to assure ... patients of confidentiality and, indeed, privileged communication.
Jaffee v. Redmond, ___ U.S. ___, ___, 116 S.Ct. 1923, 1928, 135 L.Ed.2d 337 (1996) (quoting Advisory Committee's Notes to Proposed Rules, 56 F.R.D. 183, 242 (1972) (holding that federal law recognizes a privilege that protects confidential communications between psychotherapist and patient and that this privilege extends to communications to licensed social workers as well)).
King presented evidence that staff at the hospital repeatedly assured him and at least four other members of the program that what they disclosed during their treatment would be kept confidential. There was no substantial evidence to the contrary. This is very consistent with the therapeutic model upon which the program was based. Indeed, two witnesses testified that they were told explicitly "[t]hat what went on in group stayed in group." RP (3/5/92) at 31, 39. King also presented an affidavit that states that he was required to take polygraphs, and that if the tests showed a deception, he would be returned to the courts. Ex. 4, Affidavit of Edward Lee King (1/27/89). Even if the superior court completely disregarded all of King's evidence, there was no substantial evidence to support the contrary proposition. At the very least, *619 this evidence demonstrated the state of mind of the patients at Western State. See ER 803(a)(3). The testimony of these men is not inherently untrustworthy, since some of these patients had already been released and no evidence was presented as to any sense of esprit de corps among sexual psychopaths that would cause them to present false testimony.
The State violated King's right to be free from self-incrimination by using his confessions to enhance his minimum sentence. By using his confessions after threatening to penalize him if he did not confess, the State absolved King from his affirmative duty to invoke the Fifth Amendment privilege. Moreover, King was effectively coerced into confessing by false promises of confidentiality from the staff at Western State. For these reasons, I believe King's personal restraint petition should be granted by this court, and probably will be by another.

II. DUE PROCESS
Mr. King is a violent criminal and a serial rapist; however, once he entered the criminal justice system the primary responsibility to provide that process due him under the law passed to the State. Both the prosecuting authorities and the trial courts elected to treat Mr. King as a sick man rather than a criminal who should be held personally accountable for his conduct. Absent an appeal from the original judgments, the state's election was irrevocable and vested Mr. King with certain legal rights arising from that judgment.
When the trial courts, with the prosecutors' agreement, suspended Mr. King's sentence they knew King was, by all accounts, a deliberate criminal who put a good deal of thought into his crimes in order to minimize the chances he would be caught.[5] From the large number of victims, it is clear that his precautions were initially quite successful. Not only was King not apprehended for these crimes at first, but another man was falsely accused and convicted for a rape that King had committed. CP at 124. It was only due to the efforts of reporter Paul Henderson, who eventually won a Pulitzer Prize for his series of stories on this miscarriage of justice, that this unfortunate human being was vindicated, over the objections of the prosecutors. See Don Duncan, Promises to KeepThe Wrong Man, Seattle Times at p. 8 (Oct. 8, 1989).
It is clear King committed his crimes because he enjoyed raping and could get away with it. Despite overwhelming evidence of King's coldly rational approach to crime, the King County Prosecuting Attorney's Office induced a guilty plea to avoid a trial by recommending a sentence suspended on condition of successful completion of the sexual psychopathy program. This promised King the opportunity to avoid prison. CP at 7. The sentencing judge accepted this recommendation and reduced it to a judgment, which was binding not only on King but also the State. CP at 13.[6] "A plea bargain is a binding agreement between the defendant and the State...." State v. Tourtellotte, 88 Wash.2d 579, 584, 564 P.2d 799 (1977).
King was then admitted to the sex offender program in 1982 for a 90-day period of evaluation pursuant to the King County court order. CP at 46. The staff at Western State concluded that he was a sexual psychopath.[7] *620 CP at 46. While the State was not cognizant of the full extent of King's sexual crimes, it was well aware that he had been sentenced to five 20-year sentences for committing violent rapes. If anything, to follow "psychiatric logic," King's undisclosed rapes would make him an even better candidate for this program because it enhanced his credentials as a sexual psychopath beyond any doubt. In contrast, those who maintained their innocence (even truthfully so) were not eligible.
The sex offender program consisted of three phases: an average of 24 months of inpatient treatment, a minimum of three months of work release, and a minimum of 18 months of outpatient treatment. Washington Legislative Budget Comm., Sex Offender Programs at Western and Eastern State Hospitals, Report No. 85-16, at 2 (1985). The inpatient phase of the treatment revolved around group therapy and consisted of techniques such as role-playing, "psycho-drama," and industrial and recreational therapy. Id. at 16-17. In addition to such social activities, the Western State program also utilized "mastubatory reconditioning" as a behavioral modification technique.[8] In order to monitor a patient's progress, a lab existed on the premises that utilized a penile plethysmograph.[9]
The inpatient treatment program contained ten steps. Id. at 18. Once these steps were completed, the patient would request a discharge from the inpatient phase by completing a discharge contract, which would list the conditions under which the patient would live in the work release and outpatient portions of the program. Sex Offender Programs, supra, at 18. The request would be voted on by the patient's group, approved by his therapy supervisor, and approved by the program staff. Id. Finally, the offender would return to court and, with the court's approval, be placed on probation under the terms of the discharge contract. Id.
King made good progress throughout the program, completed the requirements of the inpatient phase, and reached the point when work release would normally occur. CP at *621 109, 127. But while King was progressing, the program itself was deteriorating. By the time King's progress through the program was reviewed by staff members in January 1986 (CP at 175), the program at Western State had undergone some major shocks. On February 28, 1985, an inmate at the program, described by staff members as "extremely dangerous," escaped by running out of the hospital gymnasium and was not recaptured until almost a year later. Id. at 40. One-half hour after the escape, the entire program at Western State was "grounded."[10]Id. The grounding soon eroded the morale of both the staff and patients. Id. at 47.
In December 1985, the Legislative Budget Committee released its performance audit of the Sex Offender Programs. The results of the audit were almost uniformly negative. The audit found that there were "significant, and perhaps even critical problems within the Sex Offender Program at Western State Hospital." Id. at 4. The audit found that the program had failed to keep up with advances in treatment, the staff was overburdened, and morale was extraordinarily low. Id. The report concluded that "[g]iven these circumstances, it is difficult to imagine that any type of effective treatment is going on within the program." Id. The auditor recommended that the program should be continued only if the legislature were to allocate enough funds to make significant improvements, and, that absent such an increase, there was little justification for continuing the program. Id. at 8. In addition, after 16 escapes from 1980 to 1986, media attention began to grow and the legislature began to reassess the effectiveness of the program, particularly in regard to safety concerns in the area neighboring Western State. See Bruce Taylor, Lawmakers Focus on Sex-Crime Escapees, Seattle Times, B7 (Mar. 9, 1986).
It was in this atmosphere that King's case was referred back to the superior court for revocation of his suspended sentence. RP (3/5/92) at 99.
It seems by mid-1985 King had failed to live up to expectations by successfully completing all the steps in the program. RP (3/5/92) at 89. The staff was then prepared to refer him back to the superior court for work release. RP (3/5/92) at 89. However, King's immediate treatment supervisor and the treatment staff recognized the implications of King's release and paid a long-time state consultant, Irwin Dreiblatt, Ph.D., to write a report on King's progress. RP (3/5/92) at 90. Dreiblatt had been employed by Western State as a consultant since 1980. RP (3/5/92) at 90. Dreiblatt's report basically faults King for doing well at the treatment and holds up King's very success in the program as an example of his unsuitability for work release:
.... Although an active and successful participant in the Western State program, one is left with a sense that Ed has decided that the fastest way to freedom is to excel in the Sex Offender Program.
Ed is very intelligent and verbally facile. There can be no question that intellectually he has mastered the concepts taught at the Sex Offender Program....
There is no question that Ed has made strides in the program. However there is little integration of this intellectual learning and other affective or internal changes which must occur....
.... If the program is to work for eventual release, it would be my recommendation that this man's effort to be a "star pupil" and rapidly work through the program be thwarted and frustrated. Mr. King needs to understand that more subtle and difficult to define personality and affective changes must first occur. I predict that with such frustration, Mr. King's behaivor [sic] will errode [sic] somewhat. In my judgment, such stress in his situation will produce important working material....
CP at 117-18 (emphasis added). Even despite such "assessment," Dreiblatt still recommended King's application for work release *622 status be reevaluated within twelve months. CP at 119.[11]
Citing Dreiblatt's report, staff members wrote to the King County Superior Court stating "... Dr. Dreiblatt confirmed our suspicious [sic] and supported our bias that Mr. King had not truly integrated the treatment he had received." CP at 110. The staff continued that "[i]t is extremely unfortunate that treatment did not make any significant impact on his cognitive thought process and his affect." Id. Finally, the staff concluded "there is nothing more we can offer Mr. King and recognized [sic] that it was pointless to retain him any further." Id. Even contrary to Dreiblatt's report, however, the staff recommended that "Mr. King be incarcerated for the maximum time allowed which would provide immediate protection for the community from further victimization. Since we do not believe we have been able to really `change' Mr. King, then the best alternative is incarceration." CP at 110-11.
King was then returned to prison, where he still remains, upon a trial court determination that King had failed to "successfully complete" the sexual psychopathy program, even though he successfully completed all the tasks required of him at Western State and he was a "star pupil."
King urges another plausible interpretation of these facts. The State knew King was a serial rapist when he came to them. Thanks to Henderson's reports on the false arrest of another man for one of King's crimes, King himself was an extremely high profile individual. As the public began to become aware of what went on at Western State, and the legislature began to look into the porous security of the place, it is apparent that the program could not afford another public relations disaster. Release of the "look-alike rapist" after so short a time would have likely brought more opprobrium upon the beleaguered program. In an effort to avoid such an event, the staff went to the trouble of calling in its long-standing consultant to evaluate King outside of the normal course of treatment. The anticipated report penalizes King for doing well in the program and even goes so far as to recommend that the staff attempt to frustrate King's attempts at rehabilitation. In short, King was removed from the program and sent to prison to avoid a public relations disaster.
As to Dreiblatt's recommendations, Michael Comte, a former assistant director of the Western State program, wrote: "Dr. Dreiblatt's input was solicited and his findings and conclusions are contained in his evaluation. There are moral and ethical questions that are rather obvious." CP at 127. Perhaps Comte's reference was to a therapist's recommendation that hospital staff actively interfere with a patient's attempt to comply with his treatment program.
In fairness, King jumped through the hoops and climbed the ladders the State wanted him to climb. King kept his end of the bargain, but the State arbitrarily refused to do what it had promised. The revocation of King's suspended sentence resulted from the violation of the State's implicit commitment to him: to allow him, in good faith, to complete the program. King's suspended sentence was revoked simply because he was arbitrarily discharged from the program.
"Due process requires governments to treat citizens in a fundamentally fair manner." Valley View Ind. Park v. City of Redmond, 107 Wash.2d 621, 636, 733 P.2d 182 (1987), superseded by statute as stated in Noble Manor Co. v. Pierce County, 81 Wash. App. 141, 913 P.2d 417 (1996). "The purpose of the constitutional guaranty of due process of law is to protect the individual from the arbitrary exercise of the powers of government." State v. Cater's Motor Freight System, 27 Wash.2d 661, 667, 179 P.2d 496 (1947). This guaranty applies to all citizens, no matter how repulsive their acts. In a plea agreement the defendant gives as consideration for the state's pledge his constitutional rights to a jury trial, to confront witnesses, confront one's accusers, to remain silent, and be convicted beyond all reasonable doubt. *623 Tourtellotte, 88 Wash.2d at 583, 564 P.2d 799. The terms of the plea agreement are defined by what the defendant reasonably understood them to be when he entered his plea. State v. Cosner, 85 Wash.2d 45, 51-52, 530 P.2d 317 (1975). King was entirely justified in believing that if he pleaded guilty the State would allow him to progress through the program treatment phases and be released if he acted on his opportunity to successfully complete the program.
King's confessions to additional rapes were required portions of his treatment. It is fundamentally unfair for the State to require King to confess as a portion of the treatment it devised for him, and then penalize him for complying with this treatment. It is unfair for the State to work against a patient in its care. It is unfair for the State to say one thing, and then do another when it comes to a man's liberty. If the State wished to avoid King's premature release into the population, it should have sentenced him to prison in the first place and not induced King to waive his rights to a trial by promising more than it was prepared to deliver. The State had no business delivering King into the hands of therapists unless it was prepared to follow the result of that therapy to its logical conclusion: release. And these therapists had no business removing King from the program under these circumstances. Due process requires King enjoy the natural result of the trial court's original sentencing judgment for which he bargained away his constitutional right to a trial on his guilt. The State's ex post facto incarceration of King violated our nation and state's most basic traditions of equity and our basic constitutional guaranties of due process when he called the State's bluff by successfully completing the program.
I dissent.
ALEXANDER, Justice (concurring in dissent).
I concur in the dissent by Justice Sanders to the extent he concludes that the Indeterminate Sentence Review Board (ISRB) violated King's Fifth Amendment right against self-incrimination when it imposed an exceptional minimum sentence based on disclosures King made to staff persons at Western State Hospital during a time he was a participant in the hospital's sexual psychopathy program.
This view is consistent with Pens v. Bail, 902 F.2d 1464 (9th Cir.1990), a decision which this court should follow. The majority's suggestion that Pens can be distinguished from the instant case because King's maximum sentence had been imposed prior to the time he made his incriminating admissions to the hospital staff, whereas Pens had not, seems to me to be an irrelevant distinction. The plain fact is that King's admissions were used by the ISRB to justify the exceptional minimum sentence imposed on him. As the majority points out, the Fifth Amendment is implicated when a defendant's statement influences a sentencing decision.[1] It goes on to say, however, that by the time the Board set King's minimum term, his maximum term had been set "and the criminal proceeding was over." Majority op. at 612.
In my judgment, the criminal proceeding was not over because the final sentencing decision had yet to be made. Although the trial courts in King and Snohomish Counties had earlier determined that King should be sent to prison for the first degree rape convictions occurring within their respective jurisdictions, they had no discretion at those sentencing proceedings but to impose the maximum term of 20 years, as established by statute. RCW 9.95.010.[2] On the other hand, *624 the ISRB had considerable discretion as to what the minimum term should be.[3] Significantly, it is the minimum sentence that is of critical importance to King because it is that sentence that he will actually serve. That being the case, to say that the criminal proceeding was over prior to the minimum sentence being established defies logic.
I choose to write separately rather than concurring fully in Justice Sanders's dissent because I feel it is unnecessary to address the due process issues that he discusses in part II of the dissent. That issue was not advanced by King in his petition for review and it was not addressed at oral argument by either party. Consequently, I feel that we should not enter this legal thicket, leaving those issues for another day.
NOTES
[1] The sentence imposed does not appear to be appreciably longer than would be the standard range term under the SRA. See RCW 9.94A.310.320,.440.
[2] King also challenges the court's use of his treatment disclosures to revoke his probation. This issue was not raised in his appeal of the revocation or in the PRP he filed in 1989. Rather, he first questioned the court's use of his disclosures in a motion filed in 1992. We decline King's invitation to consider this question as an amendment to his original PRP. This challenge is, in effect, a second petition for relief that we will not consider since King has failed to show good cause why this issue was not raised in his initial petition. See RCW 10.73.140.
[3] The board of prison terms and paroles was redesignated the indeterminate sentence review board in 1986. Laws of 1986, ch. 224.
[4] Under this state's prior indeterminate sentencing scheme the trial court set only the maximum term of confinement while the Parole Board set the minimum term. RCW 9.95.010. As pointed out by the concurrence in the dissent at 614, the actual time served by a prisoner under that scheme is determined by the Board. Nevertheless, this court has held that the setting of a minimum term is not part of a criminal prosecution. In re Whitesel, 111 Wash.2d 621, 631, 763 P.2d 199 (1988). This is so because an inmate has no constitutional expectation to release prior to serving the maximum term to which the court originally sentenced. In re Ayers, 105 Wash.2d 161, 164, 713 P.2d 88 (1986). Further, the statutes direct that a prisoner shall not be released prior to expiration of his maximum term unless he is a fit subject for release as determined by the Board. RCW 9.95.100. The Board may redetermine the minimum term at its discretion, for a variety of reasons, any time prior to an inmate's completion of his maximum term. RCW 9.95.052.
[1] King's situation is different from that of the defendant in Post because Post's statements had related to crimes he had committed and for which he had already pleaded guilty or been convicted. See Post, 118 Wash.2d at 611, 826 P.2d 172. King's case is much more analogous to Warner, 125 Wash.2d at 876, 889 P.2d 479. In that case, as in King's, there was a realistic threat of incrimination in a separate criminal proceeding at the time the person made the statements because the revelation concerned previously unknown and uncharged criminal conduct. Note that the separate criminal proceeding with which these statements are concerned need not have resulted in a trial or conviction. All a defendant must establish is "a reasonable belief that there was the potential for incrimination." Post, 118 Wash.2d at 610, 826 P.2d 172. The proper consideration in such cases is not whether the prosecution occurred, or even if it was likely to occur, but whether the declarant reasonably believed that the disclosure could be used in a criminal prosecution or could lead to other evidence that might be so used. Mace v. Amestoy, 765 F.Supp. 847, 851 (1991) (citing Kastigar v. United States, 406 U.S. 441, 445, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972)). "Once the potential for incrimination is shown, the person need not show an intention on the part of the government to commence a criminal prosecution.... Making the protection of the Fifth Amendment hinge on the likelihood of prosecution `would nullify the privilege.' ... The petitioner could not possibly assess the likelihood of prosecution which is totally dependent upon the discretion of the state's attorney.... `The petitioner should not be left to the good intentions of the state when forced to incriminate himself or face incarceration.'" Mace, 765 F.Supp. at 851-52 (citations omitted).
[2] Q. [by Mr. Fox] If a person refused to answer any questions about their sexual history for fear of incrimination, it is as though they would be expelled from the program; is that correct?

A. [by Ms. Saylor] Yes, because we cannot treat something that somebody had already talked about[sic]. We were not in an adversarial role. They were there for treatment, we needed to gather data to be able to treat them. They arecriminality had been adjudicated.
Q. If someone requested the right to remain silent, you would have taken some measures with them, you would say that they were not cooperating with the treatment?
A. If someone was refusing to talk about what they were going to be done [sic], we would refer them back to court to not being treat [sic]
Q. And have their probation revoked and sent to prison?
A. Whatever the court said.
Transcript of the Proceedings (RP) (3/5/92) at 125.
[3] I. FINDINGS OF FACT

. . . .
5. During the February 16, 1982 meeting with King, Barry Charen [sic] [a therapy supervisor at Western State Hospital] advised King that information furnished for the [intake psychosocial assessment] report would be used for the purpose of determining sexual psychopathy, and could be made available to the court if the court requested. Mr. Charen [sic] also advised King that the rules of confidentiality did not apply.
6. .... To facilitate treatment, staff members encouraged patients to disclose incidents of past sexual deviancy during group discussion. The Hospital staff informed patients that their disclosures in group would be confidential from third parties such as spouses, friends and relatives, but that such disclosures would not be confidential from the courts, its officers or agents....
. . . .
19. On October 16, 1989, the Court of Appeals transferred [King's personal restraint] petition to this court for a hearing on the merits pursuant to RAP 16.11(b). The Court of Appeals specifically asked this court to answer three questions: (1) whether Petitioner was warned whether his admissions could be used against him; (2) whether he was advised that his admissions would be kept confidential; and (3) whether he was informed that fully admitting his crimes was a treatment requirement.
20. This court answers the above three questions as follows: (1) Petitioner was warned that his admissions could be used against him; (2) Petitioner was not advised that his admissions would be kept confidential from the courts, its officers or agents; and (3) Petitioner was informed that fully admitting his crimes was a treatment requirement. King was under a misunderstanding as to the limits of confidentiality. He thought his disclosures at Western State Hospital would be confidential from everyone, but in fact, he was advised that they were confidential only from third parties such as spouses, friends, and relatives....
II. CONCLUSIONS OF LAW
. . . .
2. King's disclosures at Western State Hospital that he committed approximately 50 rapes in addition to the ones of which he was convicted were not confidential from the court system, its officers or agents. The Board was part of the court system so that King's disclosures were not confidential from the Board.
. . . .
5. The case of Pens v. Bail, 902 F.2d 1464 (9th Cir.1990) is not applicable to this case because the Pens Court assumed that Pens' disclosures at Western State Hospital were confidential. The issue of confidentiality was not litigated in the Pens case.
Clerk's Papers (CP) at 171-79.
[4] Q. [by Mr. Fox] But in terms of confidentiality of the treatment component of your program, do you have any record or knowledge of any rules regarding confidentiality being in writing?

A. [by Ms. Saylor] Not in writing. It was repeatedly discussed, clarified, and I doubt that any therapists that work there for any length of time was not very clear on what their rules of confidentiality were.
Q. There was an oral rule, correct?
A. Again, I do not have anything written presently that attests to that. It certainly was real clear to everyone who was involved.
RP (3/5/92) at 127-28.
[5] For instance, King committed his first rape after reading a newspaper article that implied that many rape victims failed to report the crimes because they felt ashamed, dehumanized, and humiliated by the experience. CP at 105. King avoided physically harming his victims beyond the rape because he believed they would then be less likely to go to the authorities. CP at 114. In his attacks, however, he felt it important to do something humiliating to the victims because he felt this also would make them less likely to report the crime. CP at 114. In another move calculated to avoid detection, he preyed largely on hitchhikers and prostitutes. CP at 114.
[6] The statute that originally addressed the treatment of sexual psychopaths defined the condition as "`any person who is affected in the form of psychoneurosis or in a form of psychopathic personality, which form predisposes such person to the commission of sexual offenses in a degree constituting him a menace to the health or safety of others.'" Washington Legislative Budget Comm., Sex Offender Programs at Western and Eastern State Hospitals, Rep't No. 85-16, at 10 (1985).
[7] Before he could begin the program, however, King appeared in Snohomish County Superior Court where he pleaded guilty to three charges of first degree rape. CP at 104. He received three consecutive 20-year sentences. CP at 33. King was returned to the King County jail and then to the Washington State correction center and then to the Washington State penitentiary, where he remained for five months. CP at 105. After testifying against a fellow inmate (CP at 27), the Snohomish County Superior Court, pursuant to a stipulation of the parties, entered an order suspending the Snohomish County sentence on condition that King comply with the conditions of his King County sentence, namely, successfully complete the sex offender program, and that jurisdiction for the Snohomish County case be assumed by the King County Superior Court. CP at 61. On June 2, 1983, King was readmitted to Western State for inpatient treatment. CP at 105.
[8] The 1985 Legislative Budget Committee report described this method of treatment as follows:

Procedurally, the technique involves having the offender develop a written masturbation fantasy which must be approved by the therapy supervisor prior to its use. Emphasis is placed on developing appropriate relationships within the fantasy; i.e. the fantasy may not merely detail a particular sexual behavior, it must also include preparatory activity similar to a typical "date" which might ultimately lead to consenting sexual behavior with a given partner. On each ward there are private rooms where an individual can have privacy to engage in mastubatory reconditioning. As a safeguard, each offender is expected to speak his fantasy out loud into a tape recorder as he masturbates. This works to insure that the individual will stick to the appropriate fantasy, rather than "flashing" on a deviant fantasy. As with all treatment activities, the offender is expected to discuss these activities with his group and note any problems he may encounter in the process.
Sex Offender Programs, supra, at 17-18.
[9] A penile plethysmograph

attempts to measure physiological indications of sexual arousal in response to particular stimulus materials. The individual is placed in a room and a mercury strain gauge is placed around the penis so that the circumference of the penis can be measured ... [T]his mercury strain gauge is capable of measuring slight increases in circumference, many times before they are noticeable to the man himself. The individual is then presented with sequential stimulus materials, auditory and visual, encouraging him to think about and look at materials indicative of sexual activity with different ages of people, different genders and different sexual activities.
State v. Spencer, 119 N.C.App. 662, 665, 459 S.E.2d 812, 814-15 (1995).
[10] Grounding entailed the suspension of work assignments and ground privileges for the patients. Sex Offender Programs, supra, at 40.
[11] Michael Comte, a former assistant director of the sex offender programs, was employed by King at this time to tender his evaluation of King's progress. Comte recommended immediate work release. Comte's recommendation was "[a] two year commitment to work release would be ideal, but one year may be all that is necessary." CP at 131.
[1] The majority indicated its reliance on State v. Post, 118 Wash.2d 596, 604, 826 P.2d 172, 837 P.2d 599 (1992), in which we noted that the State had conceded that "the Fifth Amendment applies to a sentencing hearing where the State seeks an exceptional sentence." An essential predicate to such a concession is that where, as here, the State seeks an exceptional sentence, the criminal proceeding is not over until the sentence is imposed.
[2] RCW 9.95.010 provides, in relevant part, as follows:

"When a person is convicted of any felony ... the court shall sentence such person ... and shall fix the maximum term of such person's sentence only.
"The maximum term to be fixed by the court shall be the maximum provided by law for the crime of which such person was convicted, if the law provides for a maximum term." (Emphasis added.) See former RCW 9.79.170, Laws of 1979, 1st Ex.Sess., ch. 244, § 1 at 1987 (effective until July 26, 1981) (classifying rape in the first degree as a class A felony) and former RCW 9A.20.020(1)(a), Laws of 1975-76, 2nd Ex.Sess., ch. 38, § 2 at 153 (effective until July 26, 1981) (establishing the penalty for class A felonies as "imprisonment in a state correctional institution for a maximum term fixed by the court of not less than twenty years").
[3] The discretion exercised by the ISRB is effectively equivalent to the discretion now exercised by a trial court in determining whether a defendant is to serve a standard range sentence or an exceptional sentence. When King was sentenced in May 1982, and when the King County Superior Court revoked his suspended sentences and imposed an exceptional sentence in April 1986, the Sentencing Reform Act of 1981 (RCW 9.94A) contained a provision requiring the ISRB and its predecessor to "consider the standard ranges and standards adopted pursuant to [RCW 9.94A.040], and ... to make decisions reasonably consistent with those ranges and standards." Former RCW 9.95.009(2), Laws of 1981, ch. 137, § 24 at 531-32. See In re Whitesel, 111 Wash.2d 621, 630, 763 P.2d 199 (1988).