# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| DALE E. ALSAGER, D.O., | No.  47367-4-II |
| Appellant, | (Consolidated with No. 47727-1-II) |
| v. | |
| BOARD OF OSTEOPATHIC MEDICINE AND SURGERY, DEPARTMENT OF HEALTH, STATE OF WASHINGTON, | PART PUBLISHED OPINION |
| Respondents. | |

BJORGEN, C.J. — Dale Alsager appeals the Washington Board of Osteopathic Medicine and Surgery's[1] permanent revocation of his license to practice medicine, as well as several of the Board's prehearing rulings and its order denying reconsideration.  He makes two primary arguments.  First, he contends that the Board violated his federal and state constitutional rights against compelled self-incrimination by sanctioning him for failing to testify and to disclose prescription records.  Second, he contends that the Board violated his federal and state constitutional rights against unlawful searches and seizures by searching and procuring his prescription records from the state's prescription monitoring program and participating pharmacies.  He also argues that the superior court erred by dismissing his petition for declaratory judgment under the Uniform Declaratory Judgments Act (UDJA), chapter 7.24

---

[1] We refer to this entity as the Board.

No. 47367-4-II (Cons. w/
  No.  47727-1-II)

RCW, that the Board's findings of fact and conclusions of law were insufficiently supported, that a panel member should have been disqualified, and that documentary evidence was admitted without authentication.

We hold in the published portion of this opinion that the Board's proceedings did not deprive Alsager of any right against compelled self-incrimination and that the Board and Department of Health acted within constitutional bounds in procuring the prescription records. In the unpublished portion of this opinion, we hold that the superior court properly dismissed Alsager's petition for declaratory action, that the Board's findings of fact and conclusions of law were sufficiently supported, that Alsager failed to establish grounds for the panel member's disqualification, and that any error in admitting the documentary evidence without assessing authentication was harmless.  Accordingly, we affirm the Board's revocation of Alsager's license to practice medicine.

FACTS

In 2008, the Board sanctioned Alsager for inappropriately prescribing potentially dangerous medications without conducting necessary patient examinations.[2]  The sanctions prohibited Alsager from prescribing Schedule II or III controlled substances until he completed an approved residency or pain management training course.

In 2012, the Board received a complaint regarding Alsager's treatment of one of his patients and notified Alsager of the complaint.  Following the Uniform Disciplinary Act (UDA),

---

[2] Alsager appealed the Board's 2008 order, and we affirmed in an unpublished opinion. *Alsager v. Wash. State Bd. of Osteopathic Med. & Surgery*, noted at 155 Wn. App. 1016, ___ P.3d ___ (2010).

2

chapter 18.130 RCW, the Board found that the complaint had merit and initiated an investigation.  RCW 18.130.080(2).  An investigator contacted Alsager, requesting that he produce a copy of the patient's file, which included prescription records, and make a written statement responding to the complaint.

Alsager did not answer the request or provide the requested information.  Instead, he asked the Board to quash the production demand on constitutional grounds.  The Board denied Alsager's request.  The investigator then performed a search of the State's prescription monitoring program database, which archives prescriptions for medical drugs filled in Washington.  *See* Chapter 70.225 RCW.  This search uncovered prescription records showing that Alsager prescribed Schedule III controlled substances to his patients and himself after the Board issued its prior order prohibiting him from doing so.

Based on the information the investigator uncovered from the database, the Board authorized additional investigation.  The investigator again contacted Alsager, this time requesting medical records for patients to whom Alsager had prescribed Schedule II or III controlled substances since the Board issued its 2008 order.  Alsager responded, asserting that his Fourth and Fifth Amendment rights protected him from compelled cooperation.  The investigator then requested prescription records from various pharmacies.

Alsager petitioned the Board under RCW 34.05.240 for an order declaring that he need not testify or produce the requested records on constitutional grounds.  He also requested clarification as to the scope of the Board's 2008 order.  The Board denied the petition and declined to clarify the scope of the order, finding that Alsager "ha[d] not demonstrated an

3

uncertainty necessitating resolution exists with regard[] to [its] language." Administrative Record (AR) at 1919.

Alsager then petitioned the superior court under the UDJA for a declaratory judgment that the Board could not require him to testify or produce the records and that the statutes imposing those requirements were facially unconstitutional. The superior court granted the Board's motion for summary judgment and dismissed the case, reasoning that Alsager could not circumvent Washington's Administrative Procedure Act (APA), chapter 34.05 RCW, by seeking a declaratory judgment. Instead, the superior court ruled that Alsager must utilize the judicial review process under the APA. Alsager appealed, and we have consolidated this appeal with the others described below.

Alsager also brought suit in federal court seeking a declaration that his compelled cooperation would violate his constitutional rights. The federal court denied him the relief he sought, similarly reasoning that the APA provided the appropriate avenue for review of his constitutional claims. *Alsager v. Bd. of Osteopathic Med. & Surgery*, noted at 573 Fed. Appx. 619 (9th Cir. 2014).

The Board ultimately charged Alsager with unprofessional conduct under the UDA for violating the 2008 order and failing to cooperate with the investigation. For this conduct, the Board summarily suspended his license to practice. The Board held a show cause hearing on the summary suspension at Alsager's request, after which it upheld that sanction.

Before the hearing on his charges before the Board, Alsager moved for several prehearing rulings. Among other matters, he moved for rulings that his constitutional rights precluded

4

compelled testimony or production of documents, that several members of the Board should be disqualified due to the fact that they practiced in the same geographic area as Alsager, and that prescription records obtained from the prescription monitoring program database were not authenticated and were therefore inadmissible. The Board denied each of these motions.

The Board held its hearing on the merits of Alsager's charges on June 4, 2014. The Department of Health provided the prescription records from the database, as well as prescription records from pharmacies obtained by the investigator. The investigator testified and was cross-examined. Instead of making specific objections or focusing on specific topics, Alsager refused to testify or present any evidence on the general basis of the Fourth and Fifth Amendments. The presiding officer ruled that these protections did not apply and stated that it would instruct the panel that they may draw negative inferences from Alsager's refusal to testify. The Department then directed specific questions to an empty witness stand, and Alsager provided no individual responses or invocations of his rights.

The Board issued its Final Order on July 9, 2014. It concluded that Alsager had committed unprofessional conduct as defined in RCW 18.130.180 by repeatedly violating the 2008 order and by refusing to cooperate with the investigation. Based on these conclusions, the Board permanently revoked Alsager's license to practice osteopathic medicine in Washington. Subsequently, the Board denied Alsager's motion for reconsideration. Alsager appealed to the superior court, which denied the petition for judicial review.

Alsager appeals various prehearing orders by the Board, the Board's Final Order, the Board's denial of reconsideration, and the superior court's denial of the petition for judicial

No. 47367-4-II (Cons. w/
  No.  47727-1-II)

review.  We have consolidated this appeal with his earlier appeal of the superior court's

dismissal of his declaratory judgment action.

ANALYSIS

Alsager presents two primary arguments.  First, he argues that the Board violated his

constitutional right against compelled self-incrimination by requiring him to cooperate with its

investigation.  Second, he contends that it engaged in a constitutionally unlawful search and

seizure by searching the prescription monitoring program for records of the prescriptions he

wrote.  Alsager additionally argues that the Board's Final Order was not properly supported, one

of the Board's panel members should have been disqualified from serving on the panel, and the

Board erred by admitting prescription records that were not authenticated.  In his appeal of the

superior court's decision on declaratory judgment, he contends that the superior court improperly

dismissed his petition on grounds that the declaratory action was unavailable in light of the

judicial review process of the APA.  We are not persuaded by these arguments.

I.  RIGHTS AGAINST COMPELLED SELF-INCRIMINATION

Alsager argues that because a professional disciplinary proceeding is "quasi-criminal" in

nature, the Board violated his constitutional right against compelled[3] self-incrimination by

---

[3] Alsager asserts that the Board's requirement that he testify and produce patient records
constituted compulsion because it would impose penalties on him, among them revocation of this
medical license, if he failed to comply.  We agree with Alsager on this point.  RCW
18.130.180(8) defines unprofessional conduct as including
        8.  [f]ailure to cooperate with the disciplining authority by:
        (a) Not furnishing any papers, documents, records, or other items;
        (b) Not furnishing in writing a full and complete explanation covering the matter
        contained in the complaint filed with the disciplining authority;

6

requiring him to testify and produce testimonial records.  Br. of Appellant at 1-2.  We disagree

that these medical license revocation proceedings were sufficiently criminal in nature to require

application of the Fifth Amendment protection against self- incrimination. Consequently, the

Board did not violate Alsager's Fifth Amendment rights.

We review final administrative decisions under the APA.  *Feil v. E. Wash. Growth Mgmt.
Hr'gs Bd.*, 172 Wn.2d 367, 376, 259 P.3d 227 (2011).  We review the agency's decision, not the

decision of the superior court on initial review.  *Pal v. Wash. State Dep't of Soc. & Health Servs.*,

185 Wn. App. 775, 781, 342 P.3d 1190 (2015).  We will grant relief from the agency's decision

if it suffers from one of the infirmities listed in RCW 34.05.570(3), which include:

> (a)  The order, or the statute or rule on which the order is based, is in violation of
> constitutional provisions on its face or as applied;
> . . . .
> (d)  The agency has erroneously interpreted or applied the law.

RCW 34.05.570(3).  The party asserting the invalidity of the agency decision bears the burden of

showing that the decision is invalid on one of these grounds.  RCW 34.05.570(1)(a).

Alsager claims that the Board's Final Order and the statutes on which it was based violate

his constitutional rights.  We review such issues de novo, though we presume that statutes are

---

> (c) Not responding to subpoenas issued by the disciplining authority, whether or not the
> recipient of the subpoena is the accused in the proceeding; or
> (d) Not providing reasonable and timely access for authorized representatives of the
> disciplining authority seeking to perform practice reviews at facilities utilized by the
> license holder[.]

Because unprofessional conduct is grounds for discipline, including suspension or revocation of
a physician's license, RCW 18.130.160, the statutory scheme compels disclosure and general
cooperation with disciplinary proceedings. *See Spevack v. Klein*, 385 U.S. 511, 516, 87 S. Ct.
625, 17 L. Ed. 2d 574 (1967).

7

constitutional.  *City of Seattle v. Evans*, 184 Wn.2d 856, 861-62, 366 P.3d 906 (2015), *petition for cert. by Evans v. City of Seattle*, ___ U.S. ___ (2016).

A.      Quasi-Criminal Actions

Alsager argues that board proceedings for revocation of a medical license are quasi-criminal in nature and therefore are subject to the protections of the Fifth Amendment to the United States Constitution and article I, section 9 of the Washington State Constitution.  We disagree and hold that although board proceedings have a punitive aspect, they do not qualify as "criminal cases" within the meaning of those constitutional provisions.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. amend. V.  Similarly, article I, section 9 of our state constitution provides that "[n]o person shall be compelled in any criminal case to give evidence against himself."  WASH. CONST., art. I, § 9.  The protections provided by these provisions are coextensive.  *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008).

Although the language of these constitutional provisions specifies that they are applicable only to "criminal cases,"

> suits for penalties and forfeitures, incurred by the commission of offenses against the law, are of [a] *quasi* criminal nature, . . . [and] are within the reason of criminal proceedings for all the purposes of the fourth amendment of the constitution, and of that portion of the fifth amendment which declares that no person shall be compelled in any criminal case to be a witness against himself.

*Boyd v. United States*, 116 U.S. 616, 634-35, 6 S. Ct. 524, 29 L. Ed. 746 (1886).  However, this seemingly broad holding has been limited over the years.  *United States v. Ward*, 448 U.S. 242, 253, 100 S. Ct. 2636, 65 L. Ed. 2d 742 (1980).  Under *Boyd* and its progeny, the "government

8

may not abrogate the accused's privilege against self-incrimination by electing the vehicle of a nominally civil proceeding, when in reality, punishment for activity which violates the criminal law is being imposed." *In re Daley*, 549 F.2d 469, 475 (7th Cir. 1977).  A civil action is sufficiently criminal in nature if "[i]ts object, like a criminal proceeding, is to penalize for the commission of an offense against the law." *One 1958 Plymouth Sedan v. Com. of Pa.*, 380 U.S. 693, 700, 85 S. Ct. 1246, 14 L. Ed. 2d 170 (1965).

Our Supreme Court has characterized professional disciplinary proceedings involving the revocation of licenses as quasi-criminal for the purpose of determining whether due process protections apply to such proceedings.[4] *Nguyen v. State, Dep't of Health Med. Quality Assurance Comm'n*, 144 Wn.2d 516, 527-29, 29 P.3d 689 (2001); *In re Johnston*, 99 Wn.2d 466, 474, 663 P.2d 457 (1983); *In re Kindschi*, 52 Wn.2d 8, 10-11, 319 P.2d 824 (1958).  However, the full protections enjoyed by criminal defendants are not necessarily available in such quasi-criminal proceedings.  *See Nguyen*, 144 Wn.2d at 527-28 (holding that clear and convincing evidence, rather than proof beyond a reasonable doubt, is required to impose sanctions in disciplinary proceedings); *cf. Rowe v. State, Dep't of Licensin*g, 88 Wn. App. 781, 784-85, 946

---

[4] Alsager seems to take the position that the term "quasi-criminal" denotes a legally significant category of actions, much like the terms "civil" and "criminal."  However, our cases have used the term to describe, not to categorize.  *See, e.g.*, *In re Kindschi*, 52 Wn.2d 8, 11-12, 319 P.2d 824 (1958) (describing a professional disciplinary proceeding as "civil, not criminal, in nature; yet . . . *quasi criminal* in that it is for the protection of the public," and concluding that it is "a *special*, somewhat unique, statutory proceeding") (emphasis added).  Simply labeling a proceeding "quasi-criminal" is not determinative of the rights a defendant in such a proceeding may assert.  *Daley*, 549 F.2d at 476.  We do not assign any categorical legal significance to the term "quasi-criminal," and instead analyze whether a claimed right applies in the context of a particular quasi-criminal action.

P.2d 1196 (1997) (holding that suspension of a driver's license for conduct already sanctioned in a criminal case did not violate defendant's constitutional rights against double jeopardy because it served a remedial purpose beyond the criminal penalties).  Thus, we must decide whether a disciplinary proceeding for revocation of a medical license is quasi-criminal in a manner that requires application of the right against compelled self-incrimination.

Both *Kindschi* and *Nguyen* recognized that although the "consequence [of disciplinary sanctions] is unavoidably punitive," such sanctions are "not designed entirely for that purpose." *Kindschi*, 52 Wn.2d at 10-11; *Nguyen*, 144 Wn.2d at 528.  Licensure of doctors and the disciplinary procedures used to enforce it are intended not simply to ensure that doctors comply with applicable law, but "to assure the public of the adequacy of professional competence and conduct in the healing arts."  RCW 18.130.010; *see also Kindschi*, 52 Wn.2d at 10-11.  Sanctioning unprofessional conduct serves primarily to maintain professional standards and promote public health and confidence, rather than seeking punitive goals like vengeance.  This is akin to the system upheld in *Daley*:

> Because the primary function of state bar disciplinary proceedings is remedial, i.e., maintenance of the integrity of the courts and the dignity of the legal profession as well as protection of the public, we . . . hold that the Fifth Amendment privilege against self-incrimination does not proscribe the introduction in state bar disciplinary proceedings of testimony compelled under a grant of immunity.

549 F.2d at 477.  We similarly conclude that the primary object of the UDA is remedial and regulatory, not punitive.

As the United States Supreme Court discussed in *Ward*, the following factors are relevant to determining whether a nominally civil action is sufficiently criminal in nature to trigger a

defendant's constitutional right against self-incrimination:  (1) whether the penalty imposed has a "correlation to any damages sustained by society or to the cost of enforcing the law"; (2) whether the available sanctions include traditionally punitive penalties associated with criminal actions, like imprisonment or fines; and (3) whether the proceedings present some danger that the subject practitioner will prejudice himself with respect to possible criminal proceedings.  448 U.S. at 254.  Ward also relied on the "overwhelming evidence" it found "that Congress intended to create a civil penalty in all respects and quite weak evidence of any countervailing punitive purpose or effect . . ."  *Id.*

On balance, these *Ward* factors weigh against a holding that Board disciplinary actions are sufficiently criminal to trigger a practitioner's constitutional rights against compelled testimony and evidence production.  Suspension or revocation of a license for unprofessional conduct in medicine is closely correlated to ensuring safe and adequate medical care and to promoting public trust in the medical profession.  The available sanctions do not include imprisonment and are tailored to minimize or prevent further unprofessional conduct, though fines may be levied.  *See* RCW 18.130.160.  However, any authority imposing sanctions under the UDA, including fines, "must first consider what sanctions are necessary to protect or compensate the public."  RCW 18.130.160.  Thus, even the assessment of fines primarily serves a remedial, rather than a punitive function.  In addition, there is no general danger of prejudice with respect to future criminal proceedings, though in certain instances proceedings may involve conduct to which criminal liability may attach.  The final consideration in *Ward*, the

11

overwhelming evidence of legislative intent, does not weigh appreciably in either direction in the present appeal.

Under the *Ward* factors these medical disciplinary proceedings on balance are best considered civil actions, not quasi-criminal. As such, they do not necessarily trigger the constitutional protections against compelled self-incrimination.[5] Subject to the limitation discussed in Section I.B below, the Board may sanction noncompliance with its valid questions and requests for documents. *See S.E.C. v. Colello,* 139 F.3d 674, 678 (9th Cir. 1998). The Board is also free to draw adverse inferences from a physician's refusal to testify or produce requested documents, as long as such adverse inferences are supported by some other evidence. *Diaz v. Wash. State Migrant Council*, 165 Wn. App. 59, 85, 265 P.3d 956 (2011); *Doe ex rel.*

---

[5] Alsager directs our attention to cases in other states holding that professional disciplinary proceedings are sufficiently similar to criminal cases as to require the full criminal protections of the Fifth Amendment. In *State ex rel. Vining v. Florida Real Estate Commission*, the Supreme Court of Florida struck down a statute requiring realtors to make a sworn statement in professional disciplinary proceedings that were essentially "penal" in nature because they "tend[ed] to degrade the individual's professional standing, professional reputation or livelihood." 281 So.2d 487, 491 (1973). In *In re Woll*, 387 Mich. 154, 194 N.W.2d 835 (1972), the Supreme Court of Michigan held that Fifth Amendment protections are available in disbarment proceedings, basing that holding on earlier case law establishing that such proceedings are essentially punitive in nature. Both *Vining* and *Woll* were based in part on the United States Supreme Court's then-recent opinion in *Spevack*, 385 U.S. at 516-19, which held that the threat of disbarment for exercising one's Fifth Amendment rights constitutes compulsion. In both *Vining* and *Woll*, the courts seemed to read *Spevack* as suggesting that professional discipline was inherently punitive. 385 U.S. 516-19. No Washington court has construed *Spevack* so broadly, and the Court in *Spevack* declined to reach the question directly. 385 U.S. at 518-19. Given the difference in the relevant law in Florida and Michigan, we read *Vining* and *Woll* only as showing that professional disciplinary proceedings *may* be sufficiently criminal in nature to require constitutional protections against self-incrimination compelled by the threat of professional repercussions. The cases say nothing about whether Washington's UDA establishes proceedings that are sufficiently similar to criminal proceedings.

*Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000).  Because the Board also

examined other evidence that Alsager improperly prescribed controlled substances in violation of

its earlier order, it did not err in allowing adverse inferences from Alsager's refusal to testify or

respond.

B.    Invocation of Right in Civil Proceedings

We recognize, however, that testimony or other evidence compelled in a medical

disciplinary proceeding could incriminate the practitioner in potential criminal prosecutions.  In

that situation, though, the practitioner must assert his rights through specific, individual

objections, not by invoking blanket constitutional protection to avoid participating in the

proceedings.

One may assert Fifth Amendment rights in any proceeding, including civil and

administrative proceedings.  *Kastigar v. United States*, 406 U.S. 441, 444, 92 S. Ct. 1653, 32 L.

Ed. 2d 212 (1972).  Specifically, a party in a civil proceeding need not answer questions "where

the answer might incriminate him in future criminal proceedings."  *State v. King*, 130 Wn.2d

517, 524, 925 P.2d 606 (1996).

However, in a civil proceeding, the right against testifying "necessarily attaches only to

the question being asked and the information sought by that particular question."  *Glanzer*, 232

F.3d at 1265.  Therefore, a person invoking his Fifth Amendment right against self-incrimination

to avoid testifying in a civil action must assert that right specifically in response to particular

questions or requests for information.  *Glanzer*, 232 F.3d at 1265.  Alsager was not permitted to

avoid all cooperation with the Board by asserting that right generally.  *See Eastham v. Arndt*, 28

Wn. App. 524, 532, 624 P.2d 1159 (1981); *see also Matter of Baun*, 395 Mich. 28, 37, 232 N.W.2d 621 (1975) (Michigan case in the line stemming from *Woll*).  Because Alsager did not claim Fifth Amendment protections specifically or limit his assertion of the right to any particular topics, requests, or questions, he did not properly invoke it as to matters potentially related to criminal liability.

For the reasons above, these medical license revocation proceedings did not violate Alsager's Fifth Amendment rights.[6]

## II.  RIGHTS AGAINST UNREASONABLE SEARCH AND SEIZURE

Alsager argues that by searching the prescription monitoring program database for his prescription records and gathering those records from the database and pharmacies, the Board violated his federal and state constitutional rights to be free from unreasonable search and seizure.[7]  He also argues that the statutes authorizing the search are facially unconstitutional.[8] We disagree.

The Fourth Amendment to the United States Constitution provides that

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

---

[6] With this conclusion, we do not need to address the Board's argument based on the required records doctrine.

[7] No party challenged Alsager's standing to make this claim.  We assume without deciding that he has standing and proceed to the merits.

[8] The statutes Alsager asserts are unconstitutional are: RCW 18.130.050(7), .180(8), .230(1); RCW 70.02.050(2)(a); RCW 70.225.040(3).

U.S. CONST. amend. IV.  Similarly, article I, section 7 of the Washington Constitution provides that "[n]o person shall be disturbed in his private affairs . . . without authority of law."  WASH. CONST., art. I, § 7.  This state provision is more broadly protective than is its federal counterpart. *State v. Hendrickson*, 129 Wn.2d 61, 69 fn. 1, 917 P.2d 563 (1996).

Our analysis of whether the Board violated both constitutional provisions is two-pronged: we must determine whether Alsager had a protected privacy interest in the prescription records held by the State or a third party, and if so, we must look to whether the Board's warrantless search of those records was constitutionally permissible.  *See State v. Miles*, 160 Wn.2d 236, 243-44, 156 P.3d 864 (2007).

Turning first to the presence of a privacy interest, both the Fourth Amendment and article I, section 7 protect against government intrusion into one's private records.  The Fourth Amendment protects a person's "subjective and reasonable expectation of privacy."  *State v. Young*, 123 Wn.2d 173, 181, 867 P.2d 593 (1994) (citing *Katz v. United States*, 389 U.S. 347, 351-52, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)).  Article I, section 7 more broadly protects "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant."  *Id*. (citing *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984)).  Under each constitutional source, a search requires an intrusion within the perimeter of a protected privacy interest.  *Young*, 123 Wn.2d at 181.

Division One of our court has held, in an opinion both our Supreme Court and the United States Supreme Court declined to review, that a patient has only a limited expectation of privacy in prescription records.  *Murphy v. State*, 115 Wn. App. 297, 312-313, 62 P.3d 533 (2003).  The

15

court noted that "constitutional privacy protections are not absolute," and where such prescription records are concerned they "must be balanced against the need for comprehensive and effective governmental oversight of prescription narcotic use and distribution." *Id*. at 308. As the court explained, Washington law has long required pharmacists to retain prescription records. *Id*. at 313. Due to this requirement and the controlled substances laws, patients should expect the government to "keep careful watch" over them and "should reasonably expect that their prescription records will be available to appropriate government agents, subject to safeguards against unauthorized further disclosure." *Id*. at 312-13.

Although the court in *Murphy* focused on prescription narcotics records, 115 Wn. App. at 307-08, its reasoning applies to prescription records of other scheduled controlled substances as well. RCW 18.64.245 (formerly codified at RCW 18.67.090) has long required pharmacists to keep all prescription records and make them available when lawfully required. Moreover, scheduled controlled substances have been subject to robust governmental regulation at the state and federal levels for decades, based on the danger they can pose to the public. *See, e.g.*, RCW 69.50.201-.214, .308, .401; 21 U.S.C. §§ 812, 841-65. As such, we must consider patients' general interest in privacy in light of "the State's vital interest in controlling the distribution of dangerous drugs." *Whalen v. Roe*, 429 U.S. 589, 598, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977). Considering that vital interest, patients should reasonably expect prescriptions for such records to be subject to some governmental scrutiny, "subject," as noted in *Murphy*, "to safeguards against unauthorized further disclosure" by officials. 115 Wn. App. at 313.

To the extent Alsager relies on the privacy interests of prescribing physicians as well, his argument founders on the authority just noted.  Physicians, allowed by law to prescribe controlled substances under RCW 69.50.308, should be even more aware than patients that the government exercises tight regulatory oversight of these controlled substances.

Alsager argues that we should recognize a protected privacy interest, at least under article I, section 7, because two 19th century Washington statutes provided that pharmacists need not keep records of drugs distributed with a physician's prescription.  These statutes established a general requirement that pharmacists keep records of the distribution of all potentially dangerous drugs for law enforcement inspection, but both included an exception for drugs prescribed by a physician.  LAWS OF 1891, ch. 153, § 12; 1881 CODE OF THE TERRITORY OF WASHINGTON, § 936.

Neither of these statutes, however, *prohibited* pharmacists from keeping records of physicians' prescriptions.  At most, these statutes show that physicians' prescription records have not always been subject to mandatory pharmacy recordkeeping requirements.  However, as Division One noted in *Murphy*, there is a "long history of government scrutiny" over prescriptions.  115 Wn. App. at 313.  The statutes Alsager discusses do not establish that physicians have historically enjoyed any particular privacy interest in prescription records.

We adopt the reasoning and holding of *Murphy* and extend it to apply to prescribing physicians.  We hold that prescription records kept under the prescription monitoring program, either by a pharmacist or as part of the state database, are not protected from all governmental examination by the Fourth Amendment or article I, section 7.  Records of prescriptions for scheduled controlled substances are subject to legitimate oversight by appropriate agents of the

17

State if reasonably tailored to the enforcement of state law and if effective safeguards against unauthorized further disclosure are present.  Acting under these constraints, the Department and the Board did not intrude into a zone of privacy protected by either the state or federal constitutions by the examination of Alsager's prescription records kept under the prescription monitoring program, whether in the state database or held by a pharmacist.  Therefore, the Department and the Board did not violate either constitutional guarantee through this examination.

## CONCLUSION

We affirm the Board's Final Order permanently revoking Alsager's license.  The Board's proceedings did not deprive Alsager of any right against compelled self-incrimination, and the Department and the Board did not violate Alsager's right to be free from unreasonable searches and seizures when it examined Alsager's prescription records kept under the prescription monitoring program, whether in the state database or held by a pharmacist.   Alsager's remaining legal challenges, discussed in the unpublished portion of this opinion, similarly do not persuade us that the Board erred.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

III.     DECLARATORY JUDGMENT

Alsager argues that the superior court erred by dismissing his petition for declaratory judgment under the UDJA.  We disagree.

RCW 7.24.146 clearly states that the UDJA "does not apply to state agency action reviewable under [the APA,] chapter 34.05 RCW."  In such situations, declaratory judgment is instead available under the APA via the judicial review process.  RCW 34.05.574(1).  If an agency action is subject to judicial review under the provisions of the APA, it may not be preemptively decided by petition to a superior court for declaratory judgment.  *Nw. Ecosystem All. v. Washington Dep't of Ecology* (*Nw. Ecosystem All.* I), 104 Wn. App. 901, 919, 17 P.3d 697 (2001), *rev'd in part, aff'd in part*, *Nw. Ecosystem All. v. Washington Forest Practices Bd.* (*Nw. Ecosystem All.* II), 149 Wn.2d 67, 66 P.3d 614 (2003).

Alsager claims that the Board's decision not to grant him a declaratory order was not reviewable under the APA and, therefore, that he properly sought declaratory judgment in the superior court under the UDJA.  However, an agency's failure to act in the face of a duty to do so is reviewable under the APA.  RCW 34.05.570(4)(b); *Nw. Ecosystem All.* II, 149 Wn.2d at 73-74.  Therefore, to the extent the agency had any duty to issue a declaratory order related to the constitutionality of its application of the challenged statutes, its decision not to issue such an order was reviewable under the APA and was not subject to challenge under the UDJA.  If the agency had no such duty to issue a declaratory order, then Alsager's avenue of as-applied constitutional challenge was through APA judicial review of the Board's Final Order following his exhaustion of administrative remedies.  *See* RCW 34.05.534, .570(3)(a).

19

Alsager also argues that the superior court erred by requiring him to resort to and exhaust APA remedies when such remedies were futile and threatened irreparable harm to his constitutional rights. Where administrative remedies are inadequate, futile, or will result in grave and irreparable harm that clearly outweighs the public policy behind requiring exhaustion, a trial court may excuse the exhaustion requirement. RCW 34.05.534(3)(b)-(c). Because the Board has no authority to invalidate statutes on constitutional grounds, it was arguably futile for Alsager to wait for it to address the facial constitutionality of the challenged statutes. *Prisk v. City of Poulsbo*, 46 Wn. App. 793, 798, 732 P.2d 1013 (1987). However, even if we assume that the superior court abused its discretion by dismissing Alsager's facial challenges to the constitutionality of the statutes, we may affirm summary judgment on any grounds supported by the record before us. *Pac. Marine Ins. Co. v. State ex rel. Dep't of Revenue*, 181 Wn. App. 730, 737, 329 P.3d 101 (2014). Our consideration above of the merits of Alsager's constitutional claims shows that his facial constitutional challenges fail. Therefore, we hold that the superior court did not err in granting summary judgment and dismissing Alsager's UDJA claims.

IV.    SUFFICIENCY OF THE BOARD'S FINDINGS AND CONCLUSIONS

In addition to the constitutional challenges that form the basis of most of his assignments of error, Alsager challenges one of the Board's findings of fact on grounds that it was not supported by substantial evidence, and three of the Board's conclusions of law on grounds that they were not supported by sufficient findings of fact or were legally erroneous. Each of these challenges fail.

20

We will reverse an administrative agency's order if the agency's findings are not supported by substantial evidence or its conclusions of law are legally erroneous or unsupported by the findings. *Campbell v. Tacoma Pub. Sch.*, 192 Wn. App. 874, 887, 370 P.3d 33 (2016), *review denied*, 186 Wn.2d 1015; RCW 34.05.570(3). Substantial evidence is that necessary to "persuade a fair-minded person of the truth or correctness of the order." *Miotke v. Spokane County*, 181 Wn. App. 369, 375-76, 325 P.3d 434, *review denied*, 181 Wn.2d 1010 (2014). We view the evidence in the light most favorable to the Board. *Id*. at 375.

1.    Sanction Finding 1.10

Alsager argues that sanction finding 1.10 "omits critical reference to the parties' Prehearing Stipulations set forth in Paragraph 2 thereof and specific findings of fact as to reasons and rationale that Dr. Alsager can never be rehabilitated or never regain the ability to practice safely." Br. of Appellant at 9. We hold that the omission is immaterial and the finding is supported by substantial evidence.

Sanction finding 1.10 reads:

> The Board previously determined in the 2008 Final Order that the restrictions on prescribing and retraining placed on the Respondent by the Order were necessary to protect the public and to rehabilitate the Respondent. The Board provided the Respondent with a rehabilitation plan that would allow him to remove the restriction. The evidence shows the Respondent began to violate the Final Order by issuing prescriptions for Schedule III controlled substances as early as September 17, 2008 and through at least February 15, 2013. The Panel finds the Respondent's conduct (the issuance of numerous Schedule III controlled substance prescriptions) shows a disregard of the 2008 Final Order. As a result, the Board finds there is no rehabilitation plan that will ensure the Respondent's compliance.

AR at 1711-12.

21

The prehearing stipulation to which Alsager refers was that "the issue of whether Dr. Alsager has completed the pain management course is disputed." AR at 1446. Both parties agreed not to provide evidence regarding the pain management course and Alsager's alleged participation in it.

Sanction finding 1.10 makes no reference to the pain management course at all, and therefore evidence of that course was unnecessary to support the finding. The finding required only evidence that Alsager issued prescriptions for Schedule III controlled substances during the time period described, despite the conditions imposed by the Board's 2008 order. The documentary evidence of the prescriptions obtained through the prescription monitoring program and pharmacies therefore was sufficient to support the finding. From that evidence, a fair-minded person would be persuaded that Alsager exhibited a disregard of the Board's order. Accordingly, we hold that sanction finding 1.10 was supported by substantial evidence.

2.     Conclusions 2.7, 2.8, and 2.9

Alsager challenges the Board's conclusions in paragraphs 2.7 through 2.9 of the Final Order, arguing that the sanction of permanent license revocation was unauthorized and inappropriate. We hold that the conclusions were properly supported by the findings of fact and were not legally erroneous.

The Board's selection of appropriate sanctions for unprofessional conduct is governed by WAC 246-16-800, which is entitled "Sanctions – General Provisions." Subsection 2 of that rule states in pertinent part:

> (a) The disciplining authority will select sanctions to protect the public and, if possible, rehabilitate the license holder.

22

(b) The disciplining authority may impose the full range of sanctions listed in RCW 18.130.160 for orders.

. . . .

(ii) Permanent revocation may be imposed when the disciplining authority finds the license holder can never be rehabilitated or can never regain the ability to practice safely.

. . . .

(c) The disciplining authority may deviate from the sanction schedules in these rules if the schedule does not adequately address the facts in a case. The disciplining authority will acknowledge the deviation and state its reasons for deviating from the sanction schedules in the order or stipulation to informal disposition.

(d) If the unprofessional conduct is not described in a schedule, the disciplining authority will use its judgment to determine appropriate sanctions.  The disciplining authority will state in the order or stipulation to informal disposition that no sanction schedule applies.

WAC 246-16-800(2).

This provision generally governs sanctions, whether or not in a sanction schedule.  In turn, RCW 18.130.160 also discusses sanctions both under and apart from the sanction schedule, stating that "[t]he disciplining authority may order permanent revocation of a license if it finds that the license holder can never be rehabilitated or can never regain the ability to practice with reasonable skill and safety."  This requirement therefore applies to sanctions outside of a sanction schedule.  In fact, if it did not so apply, it would be robbed of most effect; since violation of a disciplinary order constitutes sanctionable unprofessional conduct under RCW 18.130.180(9), but is not described on any of the sanctioning schedules.  *See* WAC 246-16-810 - 860.  Therefore, to impose the sanctions it did against Alsager, the Board was required to use its judgment to determine whether Alsager can ever be rehabilitated or can ever regain the ability to practice safely.

The Board's conclusions at issue read in relevant part:

23

2.7 . . .In determining appropriate sanctions, public safety must be considered before the rehabilitation of the Respondent. The conduct in this case is not described in a sanctioning schedule in chapter 246-16 WAC. Thus, the panel uses its judgment to determine sanctions. The Panel considered the violation of the 2008 Final Order . . . to be the primary violation requiring protection of the public. In making its sanctioning decision, the Panel considered the pattern of the Respondent's egregious violation of the 2008 Final Order in particular. The Panel concludes the Respondent cannot be rehabilitated. The Board Panel did not reach this decision lightly and considered whether there was any lesser sanction that would protect the public in this case.

2.8 . . . The Board previously determined in the 2008 Final Order that the restrictions on prescribing and retraining placed on Respondent by [the earlier] Orders were necessary to protect the public and to rehabilitate the Respondent, yet the Respondent began to violate the 2008 Final Order even during the original period of summary restriction. The Panel concludes that retraining, restriction, and oversight have failed to rehabilitate the Respondent's conduct and that there is no lesser sanction than permanent revocation that can adequately protect the public, given the Respondent's repeated unwillingness to comply with the Boards' [*sic*] Orders.

2.9 The aggravating factors supporting the permanent revocation include the violation of the 2008 Final Order, the length of time the Respondent was violating the 2008 Final Order, the number of violations of the 2008 Final Order, and the seriousness of the underlying standard of care violations for which these sanctions were imposed. There were no mitigating factors considered.

AR 1713-15 (internal citations omitted).

Alsager argues that

in order to impose the ultimate sanction of professional license revocation with absolutely no opportunity ever for reinstatement, it is mandatory that the Board make and enter specific findings of fact as to reasons and rationale that Dr. Alsager can never be rehabilitated or never regain the ability to practice safely.

Br. of Appellant at 48. In fact, WAC 246-18-800 does not include any such requirement

regarding the Board's "reasons and rationale," although, as noted, it does require that the Board

find that the license holder can never be rehabilitated or can never regain the ability to practice

24

safely before permanently revoking a license.  The challenged conclusions set out above effectively make these findings and can be considered as such even though labeled as conclusions of law.  *State v. Federov*, 183 Wn. App. 736, 744, 335 P.3d 971 (2014).  The same conclusions also describe the Board's reasoning in detail.  More importantly, those conclusions are supported by findings of fact describing the conditions imposed by the 2008 Final Order and numerous prescriptions Alsager wrote in violation of those conditions.

Alsager also argues that the Board erred by considering aggravating factors without considering any mitigating factors.  WAC 246-16-800(3) requires the Board to consider both aggravating and mitigating factors when imposing sanctions *according to the sanctioning schedules*.  However, as noted above, violation of a disciplinary order is not covered by any of those sanctioning schedules, and therefore under WAC 246-16-800(2)(d) the Board was charged with "us[ing] its judgment to determine appropriate sanctions."  Because the evidence showed, and the Board found, a lengthy and continual pattern of violation of the 2008 order, it did not err by not considering mitigating factors.

V.  DISQUALIFICATION OF BOARD MEMBER FROM PANEL

Alsager appeals the denial of his motion to disqualify one of the members of the Board panel that judged his case on the basis of a personal business interest in the revocation of Alsager's license.  We hold that Alsager failed to show that the panel member held any bias or conflicting professional interest and that the Board did not abuse its discretion in denying the motion to disqualify.

Under the appearance of fairness doctrine, a decision-maker in a quasi-judicial proceeding is disqualified and must recuse if a party shows that he or she has "'apparent conflicts of interest creating an appearance of unfairness or partiality.'" *In re Disciplinary Proceeding Against Petersen*, 180 Wn.2d 768, 785, 329 P.3d 853 (2014) (quoting *City of Hoquiam v. Pub. Emp't Relations Comm'n*, 97 Wn.2d 481, 488, 646 P.2d 129 (1982)). Barring a "clear and nondiscretionary duty to recuse," we review for an abuse of discretion a decision-maker's denial of a motion to recuse. *Faghih v. Washington State Dep't of Health, Dental Quality Assurance Comm'n*, 148 Wn. App. 836, 843, 202 P.3d 962 (2009). We presume that the Board members acted and performed their duties properly. *City of Hoquiam*, 97 Wn.2d at 489.

Alsager claims that one of the Board members should have been disqualified because she practiced osteopathic medicine in the Maple Valley area, where Alsager also practiced, and therefore stood to potentially gain a competitive advantage from revocation of his license. Recusal is necessary if a panel member has a "substantial pecuniary interest" in the outcome of the case. *Gibson v. Berryhill*, 411 U.S. 564, 579, 93 S. Ct. 1689, 36 L. Ed. 2d 488 (1973). However, the only evidence Alsager provided was a newspaper article showing that the panel member was the medical director of a medical center in Maple Valley. This evidence, without more, shows at best a highly attenuated pecuniary interest in removing Alsager from practice. It shows neither that the member was a direct competitor nor that she stood to gain business; it shows only that she worked in geographic proximity to Alsager. It establishes no apparent bias or conflict of interest and is insufficient to overcome the presumption that the panel acted appropriately. The Board did not abuse its discretion by denying Alsager's motion for recusal.

26

VI. AUTHENTICATION OF PRESCRIPTION RECORDS

Alsager argues that the Board erred by admitting records from the prescription monitoring program because those records were not properly authenticated. We hold that any such error was harmless.

Under the APA, "[e]vidence, including hearsay evidence, is admissible if in the judgment of the presiding officer it is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs." RCW 34.05.452(1). Under the procedural regulations applicable to Board proceedings,

> (5) [f]ollowing the final prehearing conference, the presiding officer shall issue a written prehearing order which will:
> . . . .
> (c) Identify those documents and exhibits that will be admitted at hearing and those which may be distributed prior to hearing;
> . . . .
> (e) Rule on motions.

WAC 246-11-390(5). At the hearing, "[t]he presiding officer shall rule on objections to the admissibility of evidence pursuant to RCW 34.05.452 unless those objections have been addressed in the prehearing order." WAC 246-11-490(1). Administrative decision-makers have "considerable discretion" when ruling on evidentiary matters, and we review those rulings for an abuse of discretion. *Univ. of Wash. Med. Ctr. v. Wash. State Dep't of Health*, 164 Wn.2d 95, 104, 187 P.3d 243 (2008).

Alsager made a prehearing motion to exclude the prescription records, challenging their authentication among other matters. In prehearing orders, the Board denied the motion and declined to reconsider it, but did not expressly address the authentication argument. At the

hearing, Alsager again argued that the records were not properly authenticated, but the presiding officer ruled that the evidence was admitted pursuant to the prehearing orders.

Even if the presiding officer erred by failing to address whether the records were adequately authenticated, any such error was harmless. "An erroneous evidentiary ruling is not grounds for reversal absent prejudicial error." *Cook v. Tarbert Logging*, *Inc.*, 190 Wn. App. 448, 474, 360 P.3d 855 (2015), *review denied*, 185 Wn.2d 1014 (2016). The investigator testified that the prescription records were customarily used by the Department, monitored under the prescription monitoring program, connected to Alsager's registration with the federal Drug Enforcement Agency, and signed with a signature the investigator recognized as Alsager's. Thus, the testimony at the hearing established that the records are the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs. Given this uncontested evidence, the records were adequately authenticated and properly admitted by the Board.

We affirm the Board's permanent revocation of Alsager's license to practice medicine.

BJORGEN, C.J.

We concur:

WORSWICK, J.

LEE, J.

28