# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| JENNIFER JO DARE MEDLIN, | No.  60184-2-II |
| Appellant, | |
| v. | PUBLISHED OPINION |
| ANDREW ALLEN MILLER, | |
| Respondent. | |

PRICE, J. — Jennifer Medlin alleged that Andrew A. Miller assaulted her and their minor child.  As a result, Medlin requested a domestic violence protection order (DVPO) against Miller. After a full hearing on the matter, the superior court commissioner granted Medlin's petition.

Medlin then moved the superior court to prohibit Miller from possessing weapons and to issue an order to surrender weapons (OSW).[1]  The superior court partially granted Medlin's motion—it amended the DVPO to indicate that Miller was prohibited from possessing weapons, but it declined to issue an OSW.  Largely relying on case law from this court, *State v. Flannery*, 24 Wn. App. 2d 466, 520 P.3d 517 (2022), the superior court reasoned that an OSW potentially violated Miller's rights under the Fourth and Fifth Amendments to the United States Constitution.

---

[1] An OSW requires the party subject to such order to immediately surrender all firearms, dangerous weapons, and concealed pistol licenses.  RCW 9.41.800(1)(a), (b), (2)(c)(ii)(A), (B).  The order also prohibits the party from "accessing, having custody or control, possessing, purchasing, receiving, or attempting to purchase or receive, any firearms or other dangerous weapons," and from obtaining or possessing a concealed pistol license.  RCW 9.41.800(1)(c), (d), (2)(c)(ii)(C), (D).

Medlin appeals, arguing that given recent developments in the OSW statutes, the Fourth and Fifth Amendments are no longer implicated by the imposition of OSWs. We agree and reverse. We remand to the superior court to apply the OSW statutes to Medlin's request.

FACTS

In July 2024, Medlin petitioned the superior court for a DVPO against Miller. The petition requested that Miller, among other things, vacate their shared residence, not contact or come within 1,000 feet of Medlin or their minor son for three years, and immediately surrender all firearms, dangerous weapons, and concealed pistol licenses.

The petition alleged that Miller had assaulted Medlin and their two sons, one a minor and one an adult. According to the petition, Miller had tried to attack his sons, and Medlin had been injured when she had tried to protect them. The petition further alleged that Medlin feared that Miller would kill her and their children if he had access to firearms. Subsequent declarations alleged that since the beginning of their relationship in 2004, there were multiple other instances of Miller physically and emotionally abusing Medlin, threatening her, and strangling her. Medlin also submitted photos of her injuries and photos of Miller's firearms.

In August 2024, the matter was heard by a superior court commissioner. Medlin apparently understood that the commissioner would be unable to issue an OSW at that time,[2] but Medlin explained why such an order should be eventually imposed. Medlin pointed out that Miller had access to "roughly 30 firearms" and argued that during their last encounter, Miller had held a gun

---

[2] The superior court commissioner agreed with Medlin's statement during the hearing that in Pierce County Superior Court, court "commissioners do not order surrender of firearms, . . . but the judges can [for] individual cases on revision." Verbatim Rep. of Proc. at 13.

to his hip and put his hand on it multiple times, making her believe that she would be killed that night. Verbatim Rep. of Proc. (VRP) at 13.

Miller denied Medlin's allegations of abuse. He conceded that he had a firearm with him during the most recent incident, but he had never threatened or harmed Medlin. He also emphasized that he "takes the safety of his guns extremely, extremely seriously" and that he kept them locked up in a safe. VRP at 15.

The commissioner found Medlin "to be . . . more credible" and granted her petition for a DVPO. VRP at 21. The commissioner made the following findings in support of the DVPO:

> Respondent assaulted Petitioner on 7-4-24. He was arrested. Had a gun on his hip.
> Respondent owns [approximately] 35 firearms.
> Respondent grabbed and crushed Petitioner's hand, also twisting it.
> Respondent accused Petitioner of "turning my children against him."
> Respondent has frightened the younger child to the point he was cowering on the floor.

Clerk's Papers (CP) at 178.

Following the hearing, Medlin moved for the superior court to revise the commissioner's DVPO to include a prohibition on possessing weapons and to separately issue an OSW. The superior court granted Medlin's motion, but only in part. It amended the DVPO to include a prohibition for Miller to possess or own firearms, but it declined to issue an OSW. The superior court cited constitutional concerns and our decision in *Flannery*, explaining,

> This Court is not issuing an [OSW], finding that issuing such an Order would by its very nature subject the Respondent to potential criminal self-incrimination under the [Fifth] Amendment of the United States Constitution, as well as possibly raising Violations of the Respondent's right against unreasonable search and seizure under the [Fourth] Amendment of the United States Constitution.

The court further finds it does not have the authority to grant blanket immunity from the prosecution for unlawful possession of a firearm or dangerous weapon. Nor has the prosecutor granted such immunity. Moreover, even if immune from local and/or Washington State prosecution, the Respondent would remain at risk of self-incrimination on any charges brought by another jurisdiction, including but not limited to liability under 18 USC sec. 922.

In making these findings, the Court has reviewed the relevant portions of RCW 7.105, RCW 9.41.040, and *State v. Flannery*, 24 Wn. App. 2d 466 (2022) . . . .

VRP at 215.

Medlin appeals.

ANALYSIS

Medlin argues that the superior court erred when it denied her request for an OSW based on concerns about *Flannery* and potential violations of the Fourth and Fifth Amendments. Medlin contends that these concerns are no longer valid. According to Medlin, our legislature amended Washington's weapon-surrender statutory scheme after *Flannery* was decided and those amendments addressed any potential violations of Miller's Fifth Amendment rights. Medlin also cites to Division One's recent decision in *In re Domestic Violence Protection Order of Montesi*, 34 Wn. App. 2d 777, 572 P.3d 459 (2025), which she argues generally held that the current statutory scheme survives both Fourth and Fifth Amendment scrutiny.

In response, Miller does not meaningfully address these post-*Flannery* changes;[3] rather, he argues generally that issuance of an OSW still implicates important rights grounded in the Fourth and Fifth Amendments.

---

[3] Miller does not address *Montesi*, but we note that the decision was issued on June 30, 2025, less than one week before Miller filed his response brief (July 3, 2025).

## I. STANDARD OF REVIEW

We generally review challenges to a superior court's DVPO for an abuse of discretion. *Rodriguez v. Zavala*, 188 Wn.2d 586, 590-91, 398 P.3d 1071 (2017). However, if the appellant's challenges to the order require the resolution of constitutional questions, we review the issues de novo. *Flannery*, 24 Wn. App. 2d at 477.

Because both the superior court's decision and the parties' arguments implicate constitutional provisions, we start there.

## II. RELEVANT CONSTITUTIONAL PROVISIONS

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. CONST. amend IV. Fourth Amendment protections, however, apply only when "state action" occurs—the Fourth Amendment does not protect individuals from the conduct of private individuals or entities. *Montesi*, 34 Wn. App. 2d at 789. State action in this context generally involves actions taken by law enforcement who are acting as agents of the state. *Id.*

The Fifth Amendment protects against self-incrimination. U.S. CONST. amend. V. A person may exercise their Fifth Amendment rights in any proceeding " 'where the answer might incriminate [them] in future criminal proceedings.' " *State v. Brelvis Consulting LLC*, 7 Wn. App. 2d 207, 218, 436 P.3d 818 (2018) (internal quotation marks omitted) (quoting *Alsager v. Bd. of Osteopathic Med. & Surgery*, 196 Wn. App. 653, 668, 384 P.3d 641 (2016)), *review denied*, 193 Wn.2d 1019 (2019). But it is " 'well established that the privilege protects against real dangers, not remote and speculative possibilities.' " *Seventh Elect Church in Israel v. Rogers*, 34 Wn. App. 96, 100, 660 P.2d 294 (quoting *Zicarelli v. New Jersey Comm'n of Investigation*, 406 U.S. 472, 478, 92 S. Ct. 1670, 32 L. Ed. 2d 234 (1972)), *review denied*, 99 Wn.2d 1019 (1983).

There are circumstances where the administration of effective law enforcement and government function make it necessary for the government to be able to compel testimony or testimonial acts. *Pillsbury Co. v. Conboy*, 459 U.S. 248, 252, 103 S. Ct. 608, 74 L. Ed. 2d 430 (1983). If a witness is provided with immunity and, thereby "protected 'against the use of [their] compelled answers and evidence derived therefrom in any subsequent criminal case in which [they are] a defendant,' " then they may be compelled to testify without violating the Fifth Amendment. *Montesi*, 34 Wn. App. 2d at 784 (alterations in original) (internal quotation marks omitted) (quoting *Flannery*, 24 Wn. App. 2d at 480).

A civil case can have Fifth Amendment implications, but the Amendment's protections generally rest on "whether a [person]'s statements exposed [them] to a 'realistic threat of self-incrimination' in a subsequent proceeding . . . .' " *In re Dependency of Q.L.M.*, 105 Wn. App. 532, 544 n.27, 20 P.3d 465 (2001) (quoting *State v. King*, 130 Wn.2d 517, 524, 925 P.2d 606 (1996)).

III. Background on OSW Statutory Scheme

OSWs are required by statute in certain cases. The superior court is *required* to issue an OSW if it: (1) issues a DVPO and (2) finds, by a preponderance of the evidence, that the respondent has used, displayed, or threatened to use a firearm or other dangerous weapon in a felony, or is otherwise ineligible to possess a firearm.[4] RCW 9.41.800(1). Once the superior court issues the

---

[4] Even if a felony is not involved, the superior court may still have the discretion to issue an OSW. The statute provides that the superior court *may* issue an OSW "if it finds that the possession of a firearm or other dangerous weapon by any party presents a serious and imminent threat to the public health or safety, or to the health or safety of any individual." RCW 9.41.800(4).

order, law enforcement serves it on the respondent, notifies them that the order is effective upon service, and takes possession of any weapons they surrender. *See Montesi*, 34 Wn. App. 2d at 785, 790 (explaining that RCW 9.41.800 provides the basis for issuing an OSW and RCW 9.41.801 discusses law enforcement's role once the order is issued). But "[l]aw enforcement does not conduct a search unless the court finds probable cause that a crime occurred and issues a warrant." *Id.* at 790.

A. THE EVOLUTION OF THE STATUTORY SCHEME

This statutory scheme for OSWs has evolved over time. The statute initially creating OSWs generally required that the superior courts issue them, but it included few details. *See* LAWS OF 1994, 1st Spec. Sess., ch. 7, § 430. It was not until 2019 that the legislature created procedures for courts and law enforcement to effectuate OSWs. *See* LAWS OF 2019, ch. 245, § 2. At that time, provisions were added to require courts to monitor compliance with the orders and to require law enforcement to serve the orders, notify the respondent of their rights, and take possession of any surrendered weapons. *Id.*

Three years later, in 2021, the legislature made further changes. It "overhauled the statutory scheme for various types of protection orders" including making amendments to RCW 9.41.801. *Flannery*, 24 Wn. App. 2d at 470. The 2021 amendments expanded the OSW procedures even more and, for the first time, added immunity provisions for respondents who surrendered weapons. *Id.* The legislature explained that the addition of immunity provisions was

due to its efforts to increase compliance with OSWs, given the public safety crisis of domestic violence.[5] The new immunity provision read:

> An order to surrender and prohibit weapons issued pursuant to RCW 9.41.800 must state that the act of voluntarily surrendering firearms or weapons, or providing testimony relating to the surrender of firearms or weapons, pursuant to such an order, may not be used against the respondent or defendant in any criminal prosecution under this chapter, chapter 9.41 RCW, or RCW 9A.56.310.

Former RCW 9.41.801(9)(a) (2022) (LAWS OF 2021, ch. 215, § 75).

The legislature's creation of this immunity provision was important because, without it, the scheme had been held by a panel of this court to be constitutionally suspect. In *Flannery*, a panel of this court held that the 2019 statutory scheme (pre-2021 amendments) violated the Fourth and Fifth Amendments. 24 Wn. App. 2d at 472, 86. The court held that the scheme violated Fourth Amendment rights because it required respondents, without reasonable suspicion that firearms were actually possessed, to search their own homes, seize any firearms, and hand over those firearms to law enforcement. *Id.* at 477, 484. The court also explained that the statutory scheme violated the Fifth Amendment too because upon receipt of a DVPO, it was *immediately* illegal for a respondent to possess any firearms or weapons. *Id.* at 483-84. And because the law,

---

[5] The legislature's findings were as follows:

> The legislature further finds the surrender of firearms in civil protection orders is critical to public health. In keeping with the harm reduction approach of this lifesaving tool, the legislature finds that it is appropriate to allow for immunity from prosecution for certain offenses when appropriate to create a safe harbor from prosecution for certain offenses to increase compliance with orders to surrender and prohibit firearms.

LAWS OF 2021, ch. 215, § 1(4).

at that time, did not provide immunity to respondents, an OSW would essentially force respondents to incriminate themselves. *Id.*

Following *Flannery*, it appears that many superior courts stopped imposing OSWs on respondents. *See* CP at 194 ("As a result of [*Flannery*] and two subsequent memoranda issued by the Administrative Office of the Courts, some superior courts around Washington have stopped issuing orders to surrender weapons.").

Notwithstanding that *Flannery* expressly did not analyze the effect of the 2021 immunity provision added by the legislature, the legislature made further changes to the law in 2023. The legislature's 2023 amendments appeared to specifically address concerns about Fifth Amendment rights. *Compare* former RCW 9.41.801(9)(2022) *with* RCW 9.41.801(9). For example, the statute broadened its immunity provision to include *any* criminal prosecution that was derived from the respondent's surrender or testimony related to their surrender (except for perjury, giving a false statement, or failing to comply with the OSW):

> The act of voluntarily surrendering firearms or weapons, providing testimony relating to the surrender of firearms or weapons, or complying with an order to surrender and prohibit weapons issued pursuant to RCW 9.41.800 or 10.99.100, and any information directly or indirectly derived from such act or testimony, may not be used against the person subject to the order in any criminal prosecution under this chapter, chapter 7.105 RCW, or RCW 9A.56.310, or in any criminal prosecution pursuant to which such order to surrender and prohibit weapons was issued, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order. . . .

RCW 9.41.801(9)(a). The new immunity provision also required every OSW to include this protective language. *Id.*

The 2023 amendments also set out more detailed procedures to ensure that this immunity will be effective. *See* RCW 9.41.801(9)(b)-(d). For example, subsection (9)(b) allows respondents

9

who want to invoke the Fifth Amendment privilege against self-incrimination to demonstrate to the superior court that compliance with an OSW would expose them to a "realistic threat of self-incrimination." The procedures even permit this demonstration to be made in a closed courtroom, outside the presence of the prosecutor. *Id.*

Moreover, there are also provisions that permit more expansive immunity for matters unrelated to the OSW. Subsection 9(a) generally provides immunity for any criminal prosecution related to the OSW. *See* RCW 9.41.801(9)(a). But if the superior court determines that there is a realistic threat of self-incrimination regarding possible criminal prosecution beyond what is addressed in subsection (9)(a), the court must "afford the relevant prosecuting attorney an opportunity to offer an immunity agreement tailored specifically to the firearms or weapons implicated by the potential self-incrimination." RCW 9.41.801(9)(c). And, if the prosecutor declines to offer this tailored immunity agreement, then the OSW must be limited in scope. RCW 9.41.801(9)(d). The OSW may only require the respondent to surrender weapons that do not pose a realistic threat of self-incrimination related to other possible criminal prosecution. *Id.* In other words, a respondent can only be required to surrender weapons that do not risk self-incrimination. *Id.*

B. *IN RE DOMESTIC VIOLENCE PROTECTION ORDER OF MONTESI*

Recent case law has addressed the 2023 amendments' impact on the previous constitutional infirmities of the statutory scheme. While this appeal was pending, Division One issued *Montesi*, which concluded that the current version of the statute survives both Fourth and Fifth Amendment scrutiny. 34 Wn. App. 2d at 791.

Regarding the Fourth Amendment, *Montesi* expressly rejected the persuasiveness of *Flannery*, noting that its analysis was limited to responding to the State's arguments, and as such, it failed to address whether an OSW was considered a "search and seizure" under the Fourth Amendment. *See id.* at 791-92 ("The court disagreed with the State concerning the timing of a Fourth Amendment violation and concluded its argument failed for that reason alone."). Instead, *Montesi* held that there was no "state action" that is required to trigger Fourth Amendment scrutiny. *Id.* at 791. The court explained that under the OSW statutory scheme, law enforcement has minimal involvement in the administration of an OSW—they merely serve the order, inform the respondent of their rights, and take possession of any weapons that the respondent surrenders. *Id.* at 790. Law enforcement's repossession of the respondent's weapons is based on what the respondent surrenders. *Id.* No search of the home occurs "unless the court finds probable cause that a crime occurred and issues a warrant." *Id.* The court further rejected the respondent's argument that by ordering the respondent to surrender weapons, the respondent was essentially an "instrumentality of the state," concluding that this was insufficient to be considered state action. *Id.*

Regarding the Fifth Amendment, *Montesi* held that because of the statute's more robust immunity provisions from the 2023 amendments, Fifth Amendment rights were no longer implicated. *Id.* at 788. As noted above, the scheme now provides an opportunity for the respondent to demonstrate a "realistic threat of self-incrimination," even from non-related potential criminal prosecutions. *See* RCW 9.41.801(9)(b). And if the prosecutor is unwilling to extend an immunity agreement for those potential criminal prosecutions, the OSW will be limited. *Montesi* suggests that this new procedure cures the Fifth Amendment concerns. 34 Wn. App. at 786.

IV. APPLICATION

Here, Medlin argues that the superior court erred when it failed to follow the mandate in RCW 9.41.800 to issue an OSW following its grant of her DVPO. Relying on *Montesi*, she contends that an OSW does not violate the Fourth Amendment because it does not involve a "search" nor does it involve state action. Medlin further argues that, as found by *Montesi*, the immunity provided by the 2023 amendments have cured any potential Fifth Amendment issues. According to Medlin, because the issuance of an OSW would not violate any of Miller's constitutional rights, the superior court was obligated to follow the law.

Miller responds that an OSW still violates his Fourth Amendment rights. He asserts that because police are present during a respondent's surrender of weapons, the state action requirement of the Fourth Amendment is met. He argues that "a restrained party under an OSW acts under court compulsion, which could be construed as state action if police are involved in serving or enforcing the order." Br. of Resp't at 7. As for his Fifth Amendment rights, Miller contends that even with the 2023 amendments, the current statutes "do[] not protect against federal prosecutions or other jurisdictions' laws." Br. of Resp't at 6. Miller also argues that even assuming the OSW statutes are regulatory in nature because weapons surrender involves "testimonial acts" and the production of potentially incriminating physical evidence, the Fifth Amendment is still implicated. Br. of Resp't at 6-7.

We agree with *Montesi* that, following the 2023 amendments, the mere issuance of an OSW, without more, does not violate either the Fourth or Fifth Amendments.

Regarding the Fourth Amendment, like *Montesi* before us, we recognize that *Flannery*'s conclusions were strictly a product of the arguments made by the parties in that case, and we

decline to follow them.[6] Rather, we are persuaded by *Montesi*'s conclusion that law enforcement's involvement in OSW administration is so minimal that it does not rise to state action. *See Montesi*, 34 Wn. App. 2d at 790. Law enforcement does not enter or search a respondent's home, nor do they compel compliance with the order. *See id.* at 467. We reject Miller's unsupported contention that because he would be surrendering his weapons "under court compulsion," he would become personally conscripted into becoming an instrumentality of the state. *See id.* at 790 ("A court order requiring [a respondent] to "search" [their] own home for weapons is not the type of search included in the protection of the Fourth Amendment . . . ."). Thus, because there was no state action in the issuance of Miller's OSW, Fourth Amendment concerns are not implicated. The superior court erred in failing to issue an OSW on this basis.

Regarding the Fifth Amendment, like *Montesi*, we hold that the post-*Flannery* amendments, with their more robust provision of immunity, resolve any self-incrimination issues resulting from the issuance of an OSW. *See* RCW 9.41.801(9)(a)-(d). We are unpersuaded by Miller's argument that an OSW still violates his Fifth Amendment rights because he would not be protected "against federal prosecutions or other jurisdictions' laws." Br. of Resp't at 6. As noted above, the statute overtly provides him the opportunity to demonstrate to the superior court that compliance with an OSW would expose him to a "realistic threat of self-incrimination," even from potential criminal prosecutions *unrelated* to the OSW. *See* RCW 9.41.801(9)(b).

---

[6] Court of Appeals' panels are generally limited by the arguments presented by the parties. *Dalton M, LLC v. N. Cascade Tr. Servs., Inc.*, 2 Wn.3d 36, 50, 534 P.3d 339 (2023) (explaining that Washington courts generally follow the rule of party presentation).

If, hypothetically, Miller could demonstrate such a threat from a potential federal prosecution or from another jurisdiction, then, following the 2023 amendments, he would still face no realistic threat of self-incrimination. The statute instructs that resulting OSW would omit the weapons associated with those other potential prosecutions and include only those weapons that *do not* "implicate a realistic threat of self-incrimination." RCW 9.41.801(9)(d); *see also Montesi*, 34 Wn. App. 2d at 786. Thus, there is no situation that would implicate "a realistic threat of incrimination." *Q.L.M.*, 105 Wn. App. at 544 n.27 (stating that self-incrimination protections rest on "whether the defendant's statements exposed [them] to a 'realistic threat of self-incrimination' in a subsequent proceeding . . . .' " (quoting *King*, 130 Wn.2d at 524)).[7]

CONCLUSION

Courts are required to follow the law absent constitutional restraint. *State v. Peterson*, 198 Wn.2d 643, 645, 498 P.3d 937 (2021) (courts are obligated "to uphold and apply the laws properly enacted by our elected legislative bodies"). Here, voicing concerns about the Fourth and

---

[7] And it would arguably be difficult for Miller to establish a realistic risk of criminal prosecution in other jurisdictions in any event. In multiple opinions, the United States Supreme Court has suggested that the protections of the Fifth Amendment transcend jurisdictional lines. *See Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 79, 84 S. Ct. 1594, 12 L. Ed. 2d 678 (1964) (concluding that, once a witness testifies pursuant to a grant of state immunity, "the Federal Government must [also] be prohibited from making any such use of compelled testimony and its fruits"), *abrogated on other grounds by United States v. Balsys*, 524 U.S. 666, 118 S. Ct. 2218, 141 L. Ed. 2d 575 (1998); *Kastigar v. United States*, 406 U.S. 441, 460, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972) (reaffirming the "exclusionary rule" created by *Murphy* that " '[o]nce a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.' " (quoting *Murphy*, 378 U.S. at 79 n.18)); *Gelbard v. United States*, 408 U.S. 41, 64 n.2, 92 S. Ct. 2357, 33 L. Ed. 2d 179 (1972) (Douglas, J. concurring) ("For in *Murphy* we eliminated the threat that testimony to a state grand jury given in exchange for a state immunity grant could, despite the witness' fears to the contrary, be used against him by other jurisdictions.").

No. 60184-2-II

Fifth Amendments, the superior court failed to properly apply chapter 9.41 RCW and consider the imposition of an OSW upon granting Medlin's DVPO. Thus, we reverse and remand to the superior court to apply the statute to Medlin's request for an OSW.

_____
PRICE, A.C.J.

I concur:

_____
LEE, J.

CRUSER, J. (concurring)—I concur with the result reached by majority but write separately to express my view that we should make clear, as our sister divisions have, that *State v. Flannery*'s[8] holding related to the Fourth Amendment and article I, section 7 was incorrect.[9]

The trial court in *Flannery* held that requiring a party to surrender firearms pursuant to an order for firearm surrender violated the Fourth Amendment and article I, section 7 of the Washington State Constitution because:

> [T]he order directs a defendant to search his home for firearms and other dangerous weapons and bring those items to law enforcement during a period when such possession and delivery of those items would constitute a criminal law violation since there is no immunity from prosecution for him set forth in the statute.

*Flannery*, 24 Wn. App. 2d at 477-78. Stated another way, the trial court ruled that the surrender order constituted a governmental search.

The State, in its brief in *Flannery*, focused on this second aspect of the trial court's ruling (the immunity portion), arguing that if a violation of either the Fourth Amendment or article I, section 7 were to occur, it would occur at the time the State attempted to use the fruits of an illegal search *against* a defendant in a subsequent prosecution rather than at the time of the search itself. *Id.* at 485. The *Flannery* opinion rejected this contention, stating, "A Fourth Amendment or article I, section 7 violation occurs at the time of the illegal search, even if the fruits of the illegal search

---

[8] 24 Wn. App. 2d 466, 520 P.3d 517 (2022).

[9] Washington Court of Appeals' decisions are persuasive but not binding on other divisions of the Court of Appeals, nor on other panels within the same division of the Court of Appeals. They are, however, entitled to respectful consideration. *In re Pers. Restraint of Arnold*, 190 Wn.2d 136, 148-54, 410 P.3d 1133 (2018).

are not later used to prosecute a defendant." *Id.* (citing *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 325, 98 S. Ct. 1816, 56 L. Ed. 2d 305 (1978)).

However, instead of examining the threshold question of whether the trial court had erred in equating a surrender of weapons with a *governmental search* of a person's home or property, the *Flannery* court simply concluded that "[t]he trial court *did not err* in declaring the former firearm surrender statutory scheme unconstitutional as violating the *Fourth* and Fifth Amendments to the United States Constitution and *article I, section 7* and 9 of the Washington Constitution." *Id.* at 486 (emphasis added). No analysis was conducted over whether the court-ordered act of surrendering firearms actually equates to a search by a state actor.

The effect of *Flannery*, on which the State did not seek supreme court review, was immediate. Numerous trial courts across the state relied on *Flannery* and viewed the opinion as affirmatively holding that an order requiring the surrender of weapons was an unconstitutional search. *See, e.g., In re Domestic Violence Protection Order for Hernandez*, No. 40749-7-III, slip op. at 5-6 (Wash. Ct. App. Sept. 30, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/407497_unp.pdf.

Both *Montesi*, a published decision issued by Division One of this court, and *Hernandez*, an unpublished decision issued by Division Three of this court, expressly rejected the holding of *Flannery* that the trial court in that case had not erred in its ruling that a court order requiring the surrender of weapons was tantamount to an unlawful government search of the respondent's premises. *See In re Domestic Violence Protection Order for Montesi*, 34 Wn. App. 2d 777, 789-91, 572 P.3d 459, *review denied*, 5 Wn.3d 1019 (2025); *Hernandez*, No. 40749-7-III, slip op. at 12-13.

The majority opinion in this case is more muted in its discussion of the threshold question of whether an order to compel the surrender of weapons equates to a governmental search, stating "we are persuaded by *Montesi*'s conclusion that law enforcement's involvement in [order-to-surrender-weapons] administration is so minimal that it does not arise to state action," and rejecting Medlin's "unsupported contention that because he would be surrendering his weapons 'under court compulsion,' that he personally would become conscripted to becoming an instrumentality of the state." Majority at 13 (quoting Br. of Resp't at 7).

Although I certainly agree with these statements, I do not view law enforcement's "minimal" involvement as having any role in this analysis because at this initial stage, law enforcement plays no role whatsoever in the retrieval or collection of weapons to be surrendered.[10] I would prefer that we unreservedly disavow the portion of *Flannery* that, at least impliedly if not expressly, held that the court-ordered surrender of weapons constituted a governmental search of Flannery's premises in violation of the Fourth Amendment and article I, section 7. And because the Fourth Amendment and article I, section 7 are not even implicated in this circumstance, the

---

[10] The factual pattern underlying the analyses in cases such as *Flannery*, *Montesi*, and *Hernandez*, is where a person is served with an order to surrender weapons either in court or by an alternate method of service that does not involve law enforcement. *See* RCW 9.41.801(2). In either of these two circumstances, a respondent is required to "immediately surrender all firearms, dangerous weapons, and any concealed pistol license in a safe manner to the control of the local law enforcement agency on the day of the hearing at which the respondent was present in person or remotely," or to "surrender the firearms in a safe manner to the control of the local law enforcement agency within 24 hours of being served with the order by alternate service." RCW 9.41.801(2).

majority's extensive focus on the (somewhat unrealistic[11]) immunity provisions of RCW 9.41.801 is not necessary.

Nor would these immunity provisions, in my view, cure the problem if there *was* a violation of either the Fourth Amendment or article I, section 7. If it is correct to say that the court-ordered surrender of weapons constitutes a governmental search of the respondent's premises within the meaning of either the Fourth Amendment or article I, section 7, that particular constitutional violation occurs at the time of the search, not at the time the State seeks to introduce evidence found in the search in a subsequent criminal prosecution. Indeed, this was the very argument the State made in *Flannery* that the *Flannery* court correctly rejected. Thus, it makes little sense to me to discuss the immunity provisions of RCW 9.41.801 in the context of the Fourth Amendment and article I, section 7 portions of this case.

For the foregoing reasons, I respectfully concur in the result reached by the majority but write separately to express my view that we should clearly disavow the portion of *Flannery* holding

---

[11] It is arguably unlikely that a respondent would avail themself of the procedures set forth in RCW 9.41.801(9)(c) and (d) when the realistic threat of prosecution and potential punishment for whatever crime is at issue may be far greater than that which the superior court could simply impose by way of criminal contempt for failing to comply with the surrender order. Perhaps in light of this prospect, the statute makes no effort to explain the exact procedure a superior court should follow if such a respondent comes forward. Other than the provision allowing for closure of the courtroom or in camera proceedings during the trial court's *initial* consideration of the self-incrimination claim set forth in .801(9)(b), the statute does not set forth the manner in which the prosecutor will be invited to give immunity to a respondent or how and where that discussion will take place. Moreover, it is difficult to imagine a prosecutor participating in an immunity discussion in a court hearing without first knowing, before the hearing, adequate details of the crime for which a respondent seeks immunity. As it relates to RCW 9.41.801(9)(c) and (d), the statute is additionally silent on whether the immunity afforded to the respondent would be full transactional immunity or mere use immunity.

that the court-ordered surrender of weapons violates the Fourth Amendment and article I, section 7 of the Washington Constitution.

_____
CRUSER, J.